```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3      UNITED STATES OF AMERICA,

 4               Plaintiff,

 5        v                              No. 17-mj-30182

 6

 7      JUMANA NAGARWALA,

                 Defendant.
 8      _____/

 9
                             DETENTION HEARING
10
                   BEFORE THE HONORABLE MONA K. MAJZOUB
11                    UNITED STATES MAGISTRATE JUDGE
                   Theodore Levin United States Courthouse
12                     231 West Lafayette Boulevard
                             Detroit, Michigan
13                      Monday, April 17, 2017

14      APPEARANCES:

15
         For the Plaintiff:        MS. SARA WOODWARD
16                                 United States Attorney's Office
                                   211 W. Fort, Suite 2001
17                                 Detroit, Michigan 48226
                                   (313) 226-9180
18
         For the Defendant:        MS. SHANNON M. SMITH
19                                 The Law Offices or Shannon M.
                                   Smith, PC
20                                 1668 South Telegraph Road, Suite
                                   140
21                                 Bloomfield Hills, Michigan  48302
                                   (248) 636-2595
22
        Reported by:               Merilyn J. Jones, RPR, CSR
23                                 Official Federal Court Reporter
                                   merilyn_jones@mied.uscourts.gov
24

25
```

```
 1                         TABLE OF CONTENTS

 2    WITNESSES:  PLAINTIFF                              PAGE
      None

 3
      WITNESSES:  DEFENDANT

 4    None

 5    OTHER MATERIAL IN TRANSCRIPT:
      Detention Hearing                                    3

 6
      EXHIBITS:              Identified              Received

 7
      Government's Exhibit #1     5

 8

 9    Defendant's Exhibit A       19

10    Defendant's Exhibit B       20

11    Defendant's Exhibit C       20

12    Defendant's Exhibit D       20

13    Defendant's Exhibit E       20

14    Defendant's Exhibit F       21

15    Defendant's Exhibit G       21

16    Defendant's Exhibit H       21

17    Defendant's Exhibit I       21

18

19

20

21

22

23

24

25
```

```
 1                    Detroit, Michigan

 2                    Monday, April 17, 2017 - 1:45 p.m.

 3                    THE CASE MANAGER: The Court calls Case Number

 4   17-30182, the United States of America versus Jumana Nagarwala.

 5                    MS. WOODWARD: Good afternoon, your Honor. Sara

 6   Woodward on behalf of the United States.

 7                    THE COURT:   Good afternoon.

 8                    MS. SMITH: Good afternoon, judge.  My name is

 9   Shannon Smith on behalf of Jumana Nagarwala who stands to my

10   right.

11                    THE COURT: Thank you.

12                    Will the defendant please state her name to the

13   Court.

14                    THE DEFENDANT:   Jumana Nagarwala.

15                    THE COURT:   Ms. Nagarwala, you are here this

16   afternoon for purposes of a detention hearing.

17                    Are the parties prepared to proceed?

18                    MS. WOODWARD: Yes, your Honor.

19                    MS. SMITH: Yes, your Honor.

20                    THE COURT:  Ms. Woodward.

21                    MS. WOODWARD: Yes.  Can we approach sidebar for

22   just a moment?

23         (Whereupon sidebar discussion held)

24                    MS. WOODWARD: Thank you.

25                    THE COURT:   You're welcome.
```

1          MS. WOODWARD: All right.  Thank you, judge.  I'm

2     ready to proceed.

3          THE COURT: Please do.

4          MS. WOODWARD: Your Honor, in this case the

5     defendant is charged with 18 U.S.C. Section 116, which is

6     Female Genital Mutilation; 18 U.S.C. Section 2423 (a) and (e),

7     which is Transportation with intent to engage in criminal

8     Sexual Activity, including conspiracy, and also with 18 U.S.C.

9     Section 1001, which is making a false statement to a federal

10    officer.

11         If the Court finds that there is probable cause to

12    believe that this defendant has violated 18 U.S.C. 2423, then

13    this is a rebuttable presumption case and there is a

14    presumption in favor of detention.

15         The government is seeking detention of this

16    defendant because she is both a risk of danger to the community

17    and also a risk of nonappearance, and today I'm going to

18    proffer the complaint, the pretrial services report and

19    recommendation, as well as some additional facts.

20         Before I begin with the facts, I did want to note

21    that the pretrial services report and recommendation is that

22    the defendant be detained as both a risk of flight and a danger

23    to the community.

24         So, let me give the Court a little bit of

25    background.  The defendant is a member of a religious and

1    cultural community in the metropolitan Detroit area.  It is a

2    community that is also worldwide and it's a community that has

3    historically practiced female genital mutilation on girls at

4    approximately age seven.

5             The FGM, or female genital mutilation in this

6    community involves the removal of the clitoris or clitoral hood

7    from young girls. It is a secretive practice and the young

8    girls are not told about the procedure before it takes place,

9    and after the procedure they are told not to speak about it

10   with anyone.

11            Although it is a historical practice, today it is

12   even more secretive because this particular community is aware

13   that the practice is illegal.  And they are aware specifically

14   that 18 U.S.C. Section 116 criminalizes this practice.

15            And, your Honor, I only have one exhibit today.

16   I'm going to hand you what's been marked as Government's

17   Exhibit 1.  I have provided a copy to defense counsel.

18            And this is a statement, public statement released

19   by the community in Detroit specifically stating that this

20   historical practice is prohibited by Section 116.  And the

21   statement directs the community not to engage in this practice

22   and the statement was dated May 16th -- I'm sorry.  May 11,

23   2016.

24            Despite this statement on the community not to

25   practice FGM, the FBI did receive information that FGM was

1   still practiced in the community and specifically that the

2   defendant was cutting the genitals of young girls and that she

3   had been performing this procedure in the Detroit area for

4   quite some time.  Perhaps from 2005 to present.

5          The facts outlined in the criminal complaint

6   discuss the evidence that the defendant performed this

7   procedure on two girls from Minnesota and specifically that the

8   FBI received call detail records, or phone records for the

9   defendant's cell phone showing that she had contact with the

10  phone number in Minnesota in January of this year.

11  Specifically, that there was a phone call on January 21st with

12  this Minnesota number between the defendant and the Minnesota

13  number, six text messages on January 23rd, and nine text

14  messages on January 24th.

15         The FBI determined that that phone number was

16  assigned to a family in Minnesota with a seven-year-old

17  daughter and that girl was identified in the criminal complaint

18  as Minnesota Victim One.

19         The call detail records from the Minnesota

20  telephone show that that phone traveled from Minnesota to

21  Michigan on February 3rd of 2017.  And after the FBI identified

22  this activity from the phone records, the FBI reviewed

23  surveillance video depicting the parking lot of a particular

24  medical clinic in Livonia.

25         The FBI had information that this clinic was used,

1    that the defendant used this clinic to perform the FGM

2    procedures, and the surveillance video shows adults arriving at

3    the clinic, including the defendant, going into the clinic on a

4    Friday evening after business hours when the clinic was closed

5    and that after the defendant and others arrived at the clinic,

6    another vehicle arrived and a woman and a young child went into

7    the clinic.  After a period of time that child came out and

8    it's believed that a second child, that you can see on the

9    video, then went into the clinic.

10            The phone records also showed that the Minnesota

11   phone number used a tower that served a particular, hotels in

12   Farmington, Michigan and hotel records were obtained from the

13   hotel showing that a parent of one of the Minnesota victims

14   rented two hotel rooms from February 3rd to February 4th and

15   surveillance video from the hotel in fact shows two adult women

16   and two minor girls coming into the hotel.

17            On Saturday, February 4th, the Minnesota

18   telephone, according to the phone records, returned directly to

19   Minnesota.

20            Based on this, the FBI identified two young girls,

21   both currently seven years old, that live in Minnesota, and on

22   Monday of last week both girls were interviewed by child

23   forensic interviewers with the FBI. And both girls disclosed

24   that they came to Detroit together and went to see a doctor at

25   a medical clinic.

1          The first victim said that she went to the doctor

2    to get the germs out.  She identified the defendant from an

3    unmarked photograph.  She said she had to take off her pants

4    and underwear, laid on an examining table, and that the

5    defendant pinched her on her genitals and that it hurt and that

6    she was given a pad to wear in her underwear because she was

7    bleeding. And she said that the next day it hurt a lot and that

8    she was told not to talk about the procedure.

9          This child was examined by a doctor pursuant to a

10   search warrant and the doctor concluded that there was medical

11   evidence that FGM had been performed on this child and that her

12   genitals were not normal in appearance.

13         The second seven-year-old girl was also

14   interviewed by a child forensic interviewer and she also

15   identified the defendant as the doctor she saw in Detroit.  She

16   said that the defendant took off her pants and underwear, put

17   her on the table, that she got what she called a shot in her

18   upper right thigh.  She drew a picture of the examining room

19   and put an X on the table for where she said there was blood on

20   the table and she also said that she was told the procedure is

21   a secret and that she's not suppose to talk about it.

22         She said that after the procedure she could barely

23   walk from the pain and that the defendant told her that she was

24   fine.  And she said that she left one of her winter gloves at

25   the clinic.

1             This child was also examined by a child abuse

2    pediatrician and the doctor also saw that there was some

3    evidence of a healing injury or scar on her clitoral hood.

4             One of the parents of one of these girls in

5    Minnesota was interviewed by the police and child protective

6    services and this parent confirmed that the parent took their

7    child to Detroit to see a doctor for a cleansing, and then

8    while in the presence of the authorities this parent made a

9    phone call to the defendant and she said that the police had

10   contacted her and asked the defendant what she should say and

11   that defendant told this parent to deny everything and to give

12   an excuse for why she came to Detroit.

13            On the same day that the two children in Minnesota

14   were interviewed by child protective services and by the FBI, a

15   number of children in Michigan were also interviewed.  Some of

16   these children also disclosed that the defendant had performed

17   procedures on their genitals.  Specifically, one child said

18   that the defendant had performed a medical procedure to remove

19   her bump from her precious package with a long curved tool with

20   a split end.

21            Another child also described having a bump removed

22   and said she screamed in pain and was told to be quiet.

23            And another child said that the defendant

24   performed a procedure on her and it was part of her body where

25   she goes to the bathroom and that after the procedure she was

1    hurting and crying.

2              The dates that these procedures would have

3    occurred on the Michigan victims range for years.  The conduct

4    of the defendant spans years and the two children from

5    Minnesota, while we have the most concrete evidence about the

6    procedures the defendant performed on those children, there is

7    nothing to suggest that this is the first time the defendant

8    did this procedure.  In fact, it would have been that she had

9    done this, the evidence suggestions she had done this to many

10   other children as well.

11             Other children were interviewed on that same day,

12   on Monday, April 10th, and some of those children made no

13   statements about FGM procedures or about the defendant.

14             Some parents in Michigan were also interviewed and

15   some parents admitted that the defendant had performed

16   procedures on their daughter genitals, daughter's genitals

17   while others denied knowledge of the procedure or said that it

18   did not happen.

19             On that same day, Monday of last week, the

20   defendant was interviewed by child protective services and by

21   law enforcement and the defendant stated that she was aware

22   that FGM was illegal.  She said she had no knowledge of FGM

23   being performed by anyone in her community; said she had never

24   performed FGM on any minor children, and that she was not

25   involved in any FGM procedures.

1          That evening, on the evening of April 10th, the

2     medical clinic in Livonia was also searched by the authorities

3     and a member, the doctor who runs that clinic was interviewed

4     by the FBI, and he said that he knows the defendant.  He

5     admitted that she does see patients at his clinic.  He said

6     that the patients that she sees are girls within their

7     community between ages of six and nine; that she does not bill

8     or otherwise charge for the procedure and that she does treat

9     the children for problems with their genitals but said that

10    that problem was rashes.  And he said that she sees them at his

11    clinic when it is closed on Friday evenings or Saturdays and

12    that she had seen children in this manner at his clinic after

13    hours without creating any billing and specifically children

14    within the community approximately five to six times per year

15    and that on some occasions she saw multiple children.

16          That evening the defendant's home was also

17    searched by the FBI and she declined to make any statements.

18    But despite everything that happened on Monday, the forensic

19    interviews of numerous children within the defendant's

20    community in Michigan and in Minnesota, her interview with CPS

21    and law enforcement, the search of her home, and the search of

22    the medical clinic in Livonia, two days later, on Wednesday,

23    April 12th, the defendant was arrested at the Detroit

24    Metropolitan Airport where she was boarding an international

25    flight with a final destination of Nairobi, Kenya.

1           And the government concedes that this is a trip

2    she had planned before the events of Monday, April 10th, but

3    that despite everything that had happened on Monday, that she

4    was still planning to leave the country.

5           On Wednesday, the day that the defendant was

6    arrested, the FBI also seized the defendant's cell phone and

7    her phone was searched pursuant to a search warrant and in fact

8    she provided the government with her password.

9           And all I'm going to mention from the search of

10   her phone is that the evidence suggestions, first, that the

11   defendant had contact using her cell phone with one of the

12   parents in Minnesota in January of this year, but also that

13   significant text messages appear to have been deleted from her

14   phone.

15          I mentioned at the beginning of this factual

16   proffer that the defendant had a phone call on January 21st

17   with one of the parents and on January 23rd we could tell from

18   the phone records that she exchanged six text messages with

19   that number.  Only one of those six text messages remains on

20   the defendant's phone and that was a text message from the

21   defendant to the Minnesota number stating, "February 3rd at

22   6:45 p.m.?"  And the other five messages have been deleted.

23          On January 24th we know from the phone records

24   that the defendant exchanged nine text messages with this phone

25   number, but only two remain on her phone.  Those two messages

1    were incoming to the defendant's phone and stated:

2              "Provide me the address.  We are planning to drive

3          from here and we are coming together, we join the

4          meeting that we scheduled, and go back together."

5              And, your Honor, at this time that concludes my

6    factual proffer.  I can pause now and move into argument if

7    you'd like.

8              THE COURT:   I would prefer that you move to

9    argument.

10             MS. WOODWARD: Certainly.

11             Of course, the Court has four factors to consider

12   under 18 U.S.C. Section 3142(g).

13             The first factor is the nature and circumstances

14   of the offense charged, including whether the offense is a

15   crime of violence or involves a minor victim.  Here the offense

16   involves numerous minor victims.  The nature and circumstances

17   of this offense are that there is incredibly strong evidence

18   that two very young victims were cut by this defendant very

19   recently in February of 2017, but the evidence suggestions

20   these were absolutely not the first of the defendant's victims

21   and instead they were last in a long line of children cut by

22   the defendant.  The evidence suggestions the defendant has

23   countless victims and that we could believe that the impact on

24   these victims will be lifelong.  It is hard to determine the

25   complete number of victims due to the nature of this crime and

1    that it is incredibly secretive.

2              The nature and circumstances of the defendant's

3    crime also include what this must be like for the victims in

4    this community now who will face pressure from the community

5    and from the defendant not to cooperate with law enforcement,

6    and so the crime itself is, of course, heinous, but the

7    pressure on the children in this community now to lie to help

8    the defendant and their parents is enormous and simply

9    something that children should not have to bear.  And there is

10   no question that the defendant knew that this was illegal, but

11   she did it anyway.

12             So the nature and circumstances of the offense

13   weigh heavily in favor of detention here.

14             Another factor for the Court to consider is the

15   history and characteristics of the defendant.  Here the

16   defendant is a U.S. Citizen.  She was born in Washington D. C.

17   She is very well educated and has a medical degree and as a

18   medical doctor there is no question that she is aware that FGM

19   has no medical purpose.

20             Her history and characteristics also include

21   significant resources, and those are outlined in the pretrial

22   services report, and, therefore, that this defendant absolutely

23   has the financial resources and incentive to flee, and, of

24   course, she was arrested here while boarding an international

25   flight.  And the history and characteristics include her past

1    conduct, which includes the length of time that she has been

2    performing this procedure on young girls.

3                Another factor for the Court to consider is the

4    weight of the evidence against the person regarding

5    dangerousness and risk of flight, and the weight of evidence,

6    of danger, the defendant's dangerousness is strong because

7    there is strong evidence of the crime and strong evidence that

8    she was not deterred by her knowledge that this was in fact a

9    federal crime.  And the weight of the evidence of her flight

10   risk is also strong because we know that she has significant

11   resources, that she has a motive to flee, that she has

12   international connections, and that she was, in fact, despite

13   everything that had happened in her community and the chaos in

14   her community on Monday, she was still attempting to leave the

15   country.

16                And, lastly, but certainly not least, the Court

17   must consider the nature and seriousness of the danger to any

18   person or the community that would be posed by the person's

19   release, and here this last factor also weighs in favor of

20   detention.  That is because the defendant knew before her

21   arrest that this was an illegal procedure, but she proceeded to

22   do it anyway and the only difference now is that she has been

23   caught and that she faces time in prison.  And the danger to

24   the victims in the community and to the community overall

25   includes also the danger that the defendant would continue to

1    attempt to obstruct justice, that she or others will place

2    pressure on victims in the community to recant their statements

3    or to lie to the police or that she will pressure other

4    witnesses in the community to lie.

5            We know specifically that she directed the mother

6    in Minnesota to deny everything and we can assume that she has

7    said the same to other witnesses and would continue to say the

8    same.

9            The defendant herself also lied to the authorities

10   when she denied having any knowledge about this procedure, and,

11   finally, she has deleted significant text messages from her

12   phone, and for those reasons, your Honor, the government asks

13   that the Court find that there is no condition or combination

14   of conditions that can reasonably assure the safety of the

15   community or the defendant's appearance and find that she be

16   detained pending trial.

17            THE COURT:   Thank you, Ms. Woodward.

18            Counsel.

19            MS. SMITH: Thank you.

20            Your Honor, is the Court okay if I stand by the

21   table, I have everything laid out.

22            THE COURT:  Certainly.

23            MS. SMITH: Okay.  I just want to make sure you can

24   hear me.

25            THE COURT:   Certainly.

1                    If I can't hear you, I'll let you know.

2                    MS. SMITH: Okay.  Thank you.

3                    Okay.  Your Honor, the first problem in this case

4     is that the issue of FGM is one that presents many issues

5     related to vagueness.  There are four types of FGM that exist

6     according to the World Health Organization and all of the acts

7     that my client was performing on children did not meet the

8     criteria of those four definitions of potential FGM, and when

9     the prosecution started, Ms. Woodward explained to the Court

10    that the FGM procedures include the removal of the clitoris or

11    the clitoral hood on young children.  The evidence in this case

12    will not support that Dr. Nagarwala has ever removed the

13    clitoral hood or clitoris on any young female.

14                   The media that has grabbed attention and has

15    taken, has printed articles and posted articles about this case

16    have made the facts of this case appear to be far, far, far,

17    far more egregious than what was actually happening.

18                   My client did meet with law enforcement.  She did

19    deny having knowledge of FGM or that she had performed FGM and

20    she stands by those statements today.

21                   The medical evidence that was determined from the

22    two young ladies from Minnesota who came and saw Dr. Nagarwala,

23    the medical findings do not support that they had their

24    clitorises removed or clitoral hoods removed, and so there is a

25    lot of discrepancy between what was really taking place and

```
 1    what some of these reports show.

 2                    There is also an abundance of vagueness in issues

 3    with respect to the terminology that is being used in this

 4    case.

 5                    In the Government's Exhibit 1 there's a letter

 6    dictating that genital mutilation is inappropriate, and my

 7    client agrees with that, and in portion two it states that it

 8    is possible that khafd, also recognized by some as khatna, or

 9    female circumcision is illegal and should not be prohibited.

10                    It is my client's absolute position that she was

11    not engaging in the words that are on this page in paragraph

12    two.  She is presumed innocent and there will be an issue

13    whether what she was doing even meets the criteria of female

14    genital mutilation.

15                    That being said, we understand this is a very

16    serious case.  We understand that the circumstances surrounding

17    this offense are serious, and my client does take this

18    seriously.  My client has been cooperative.  She allowed me to

19    turn over her cell phone through law enforcement through her

20    husband.  She allowed me to provide her password.  She did meet

21    with law enforcement and discuss this with them on Monday night

22    last week.

23                    My client denies that she has made efforts to

24    encourage other people not to go to law enforcement.  She

25    believes that she has actually encouraged people to be only
```

```
 1    honest about what was actually taking place.
 2                   In terms of my client, the weight of the evidence
 3    against her shows that this is going to end up being a very
 4    complicated complex case that's going to require a serious
 5    amount of litigation.  That is all the more reason that Dr.
 6    Nagarwala should be allowed to be confined to her home, which
 7    would protect the community and keep her from fleeing.
 8                   My client has been in this country her entire
 9    life.  She was born in Washington, D.C.  She attended school at
10    Johns Hopkins Medical School.  She went to the University of
11    Maryland.  Her parents both live in this country.  Her parents
12    right now are in town in Michigan and she lives with her
13    father-in-law, her husband, and she has four children.
14                   Two of her children are in boarding school right
15    now in Nairobi, where Dr. Nagarwala planned to go visit for the
16    opening, a grand opening of a new campus over in Nairobi.
17                   My client's passport was seized from her.  It is
18    in the possession of the government.  We, obviously, have no
19    objection to that.  And any future travel plans would be
20    canceled by my client.  All of the travel plans that my client
21    did have scheduled indicate she's always had the intention to
22    return to the United States.
23                   And very briefly I can just tell the Court she was
24    scheduled on April 12th to leave the country to go visit her
25    two daughters.  I have brought as Exhibit A with me proof of
```

1     the round trip plan ticket showing that she would have been

2     returning on 4-24 of '17.

3             As Exhibit B, which I will provide to the Court, I

4     have a flight on April 27th my client had scheduled down to

5     Florida because she was scheduled to give a presentation in

6     Florida to other doctors about how to survive a midnight shift.

7             After her trip to Florida she was going to depart

8     from Fort Lauderdale and be traveling to India for a family

9     wedding, which is confirmed by Exhibit C, which I will provide

10    the Court.

11            And while in India she was going to be attending a

12    wedding, which will be confirmed by Defendant's Proposed

13    Exhibit D.  It's the invitation indicating that there were

14    wedding festivities on the 5th and 6th of May.

15            However, my client did plan to return back to the

16    United States and was scheduled to come back on May 15th, which

17    is part of the itinerary as you will see.

18            After that she had a plan to go to Houston on May

19    19th, which is shown by Exhibit E.  It's a round trip ticket to

20    and from Houston because Dr. Nagarwala's oldest daughter just

21    became engaged, and they were going to have some engagement

22    parties.

23            The point is my client had every reason to return

24    to the United States and to return to Michigan and to be here

25    and all the intentions and plans that she made months before

1    she knew of this investigation would support the same.

2              There is also confirmation as Exhibit F that Dr.

3    Nagarwala was going to attend and speak at this medical

4    conference in Florida.

5              And I'm providing the Court with Exhibit G, which

6    is a copy of the presentation that Dr. Nagarwala was going to

7    present.

8              I'm providing to the Court Exhibit H, which is

9    documentation from the school her two daughters attend showing

10   that there were events that she was planning to attend, which,

11   again, she was going to return to the United States for.

12             And Exhibit I, which is her registration to

13   partake in those festivities.

14             At this time my client's ties to Michigan are far

15   more strong than any ties she has internationally.  She has

16   resided in her Northville home for more than 12 years.  Prior

17   to that she resided in a home in Troy for more than 12 years.

18   Her husband and herself own both of those homes free and clear.

19   They have substantial amounts of real estate in the area that

20   they rent out.

21             They have a business in Canton, Michigan that Dr.

22   Nagarwala partially works. Their family is in Michigan in terms

23   of their father-in-law, her husband, and children who attend

24   school in the Northville District.

25             Dr. Nagarwala has no intention to leave the state

1    or the country and would absolutely stipulate to home

2    confinement with a GPS tether so there is no question about

3    where she is going.

4                She has the ability to post a secured or surety

5    bond in this matter, and the family has -- I'm sorry.  Dr.

6    Nagarwala has assets that will allow her to do this to reassure

7    the Court that she will be back in court for every court date.

8                She has absolutely no criminal history and has

9    never even had contact with law enforcement prior to these

10   allegations at 44 years old.

11               Further, Dr. Nagarwala would stipulate to not have

12   contact with anyone from the community, to not attend the

13   mosque services that she normally attends, and to not have

14   contact with any other witnesses in this case, aside from her

15   husband or children, family members who live in the home.  I

16   would even make it clear that my office, myself, I would go to

17   Dr. Nagarwala's house so that she would not even have to leave

18   home confinement to come to my office for attorney

19   appointments.

20               I am asking the Court to consider home confinement

21   with a tether, a bond, I believe that would be the least

22   restrictive way that would still allow Dr. Nagarwala to not be

23   detained, but keep the community safe and keep any risk of

24   flight.

25               By not having contact with others from the

1    community she will have no ability to influence or do anything

2    that could cause any obstruction with this investigation or the

3    evidence that will be coming out.

4              And, your Honor, unless the Court has further

5    questions, may I approach with my exhibits?

6              THE COURT:   You may, but I do have a couple

7    questions.

8              MS. SMITH: Sure.

9              And I did show these to counsel prior to coming on

10   the record.

11             THE COURT:   That wasn't one of my questions.

12             MS. SMITH: Okay.

13             THE COURT:   It seems, Ms. Thompson, that you are

14   admitting that this defendant did see young girls in a clinic

15   owned by some other individual after the clinic was closed on

16   Fridays, at least February 3rd is a Friday, and that this did,

17   these meetings did happen in a clinic where she performed some

18   sort of procedure.

19             MS. SMITH: That is correct.

20             THE COURT: You have told us what she has not

21   performed.  What is it that she did perform and what was she

22   doing with these young girls?

23             MS. SMITH: Your Honor, what was being performed

24   was a religious procedure where my client would look at -- on

25   the clitoris of the girls, there's a mucus membrane.  She would

1    wipe a little portion of the mucus membrane off, put it on a

2    piece of gauze, which the family would then take the gauze with

3    the mucus membrane and they would bury it.  That was part of

4    the religion and the customs in what this culture does.

5              THE COURT:  Would you define the culture for me?

6    Everybody has talked about this community and this culture,

7    will you tell me specifically what we're talking about?

8              MS. SMITH: Sure.

9              This is -- the religion -- this is a Muslim

10   religion and the sect from the church is the, I don't want to

11   say it wrong, Dawoodi Bohra, which are, they're a small sect of

12   -- well, they're known to be a nonviolent community that has

13   congregations locally in Michigan and also all throughout this

14   country.

15             So, my client belonged to a mosque where they

16   attend services and had meetings and things along those lines.

17   One of the major issues in this case is that within that

18   community there has been a split and there has been one group

19   of people following one leader, and one group of people

20   following another.  This is a highly political controversy

21   within their community and what has happened as a result is

22   that some of the people on one side have begun lodging false

23   allegations on the other and vice versa.  We believe that some

24   of the reason this issue is coming before the Court is due to

25   this essentially political divide in the community of people

1    who have split off from the main community.  That is one major

2    piece of information that we will have to conduct investigation

3    on to understand.

4              THE COURT:  So, you're telling the Court that

5    your client performed a surgical procedure --

6              MS. SMITH: It was not a surgical procedure.

7              THE COURT:  Let me finish.

8              She used instruments to remove tissue from the

9    clitorises of young girls and the tissue removed you're saying

10   was a mucus membrane.

11             MS. SMITH: I am not saying she removed any tissue,

12   and I am not saying that she used instruments to remove the

13   tissue.  I am saying there's mucus on top of the parts, on top

14   of the female anatomy and that the mucus would be essentially

15   wiped away.

16             THE COURT:  Mucus would fit the definition of

17   tissue, no?

18             MS. SMITH: I don't believe --

19             THE COURT:  You're saying she removed fluid?

20             MS. SMITH:  Fluid like a --

21             THE COURT:  And buried fluid?

22             MS. SMITH: Yes.

23             THE COURT:  That's what you're telling this

24   court?

25             MS. SMITH: Yes.

```
1              THE COURT:   And she did this surreptitiously in a
2   clinic, not elsewhere, but in a clinic, a closed clinic, right?
3              MS. SMITH: Yes.
4              THE COURT:   And made no records of this?
5              MS. SMITH: That's correct.
6              THE COURT:   Why in a clinic?
7              MS. SMITH: It was not done as a medical procedure.
8              THE COURT:   Why in a clinic.
9              MS. SMITH: Just to have sanitation so there could
10  be no risk of infection, or anything, by exposing private parts
11  to anything dirty or that could contaminate that area.
12             THE COURT:   Clinics aren't necessarily sterile.
13             Why a clinic?
14             MS. SMITH: That's where, that's just the best
15  place that they had to do these procedures.
16             And, like I said, my client would have no contact
17  with the clinic or be in the clinic, obviously, if she was
18  confined to house arrest.
19             THE COURT: So you're saying only fluid was removed
20  from the end of the clitoris, the tip of the clitoris, that
21  fluid was buried, right?
22             MS. SMITH: And, your Honor, the reason it was done
23  this way was to avoid getting into any acts that could be
24  considered FGM, which would involve cutting or excising
25  portions of the clitoris.
```

1                    THE COURT:   Understood.

2                    Now, let me continue.  And you're saying,

3    therefore, I assume, and correct me if I'm wrong, that the

4    findings of the examining physicians are in error.

5                    MS. SMITH: No, I am not saying that.  I am saying

6    that the findings of the examining physicians may have been

7    caused by other, by even a child's scratching her vaginal area,

8    that could cause what would appear on a forensic medical

9    evaluation, or it's also possible -- well, I suppose that's the

10   answer. I don't -- the activity that I understand that my

11   client was conducting would not go with those medical findings.

12   And again those --

13                   THE COURT:   So whatever happened to those girls

14   and whatever findings were made by the examining physician, had

15   no relationship to your client's activities with these

16   children, is that what you're saying?

17                   MS. SMITH: That's absolutely correct.  And at this

18   point my understanding on those medical findings, that they

19   only went so far as to say it appeared there was an

20   abnormality.  There are not details about what those medical

21   findings showed.  We have not seen any of the evidence about

22   what exactly the abnormality included.

23                   The vaginal areas of young girls can frequently

24   show abnormalities that are not caused by any type of procedure

25   and so this is also going to be a complex issue we need to look

```
 1    forward to in litigation of this matter.
 2              THE COURT:   I would agree with you.
 3              Okay.  Is there anything further?
 4              MS. SMITH: No, your Honor, unless the Court has
 5    further questions.
 6              THE COURT:   I might, but I'll reserve them.
 7              Ms. Woodward, do you have anything to say in
 8    response?
 9              MS. WOODWARD: Your Honor, I would just say that
10    about her travel plans, as I said, we concede that she was, had
11    plans to leave and return to the country, and at the time she
12    booked her flights I'm sure it was her intent to return, but
13    now that all of this has happened and that she is facing very
14    severe criminal charges, I don't think it's a big leap to infer
15    that her plans to return could likely have changed.
16              Otherwise, I have nothing further.
17              THE COURT:   Anything from the defendant?
18              MS. SMITH: No, your Honor.
19              THE DEFENDANT:   No, your Honor.
20              THE COURT:   I still do not have a clear sense of
21    what this community is and of whom it consists.  Can you just
22    elaborate for me a little bit more?
23              MS. SMITH: Sure.
24              This is a, there is a local mosque.  They are, the
25    Dawoodi Bohra community has --
```

```
1                    THE COURT:   Could you spell that.  That's not
2       mentioned on Exhibit 1.
3                    MS. SMITH: It's on number three.  D-A-W-O-O-D-I --
4                    THE COURT:   All right.  I see it.
5                    MS. SMITH:  Bohra is B-H -- B-O-H-R-A.
6                    The Dawoodi Bohra are Muslims who have
7       congregations around the world.
8                    THE COURT:   All right.  Is this sect intrinsic to
9       any particular part of the world?
10                   MS. SMITH: India.
11                   THE COURT:   This is an Indian sect.
12                   MS. SMITH: Yes.
13                   THE COURT:   All right.  Let's start with that.
14      All right. Thank you.
15                   MS. SMITH: And I apologize, your Honor, I'm
16      learning a lot about the Dawoodi Bohra.
17                   THE COURT:   As are we all.
18                   MS. SMITH: They have a local mosque and so there
19      is a population --
20                   THE COURT:   Where is the mosque?
21                   MS. SMITH: It's in Farmington Hills.
22                   And so they have a local population of congregants
23      who attend that mosque and go to functions and events there and
24      pray there.  My client is a member of that community and of
25      that mosque.
```

1              There are also other mosques in communities

2       throughout the country.  There are some in Australia.  There

3       are many in India.  They are known throughout the world.

4              THE COURT:  All right.  I have a question of Mr.

5       Mitchell if he would approach.

6              MR. MITCHELL:  Yes, your Honor.

7         (Pause)

8              THE COURT:  I was given two copies of Exhibit 1.

9       I'm going to pass one back.

10             Excuse me while I review Exhibit 1.

11             Okay.  Ms. Thompson, I am going to ask you one

12      more question, and it's, I've asked it, but I'm, I asked it

13      previously but I'm going to ask it in a different form.

14             Your position is that your client did not in any

15      way directly or indirectly engage in what is described here as

16      khafd?

17             MS. SMITH: Or khatna, which is in the next line.

18             That's correct.

19             THE COURT:  And what you describe as what your

20      client actually did engage in with seven-year-old girls and

21      others over time, in a closed clinic, where no records were

22      being made, no charts and nothing was billed, you're saying

23      there was no payment for this?

24             MS. SMITH: That's correct.

25             THE COURT:  Not cash or otherwise?

```
 1                    MS. SMITH: That's correct.

 2                    THE COURT:   Is what?  You're saying a removal of

 3       mucus?

 4                    MS. SMITH: A removal of mucus.

 5                    THE COURT: Let me stop you right now.

 6                    When the mucus was removed, where was it placed?

 7       Was it placed on a slide?

 8                    MS. SMITH: The amount of mucus would look to be

 9       about the amount of a sesame seed.  It would be placed on a

10       piece of gauze.  The gauze would be just pinched together;

11       given to the family to be buried.  That's the religious

12       procedure that was used.

13                    So we're talking about a very small amount of

14       mucus.  It's not possible to hold mucus because it's not

15       something tangible that you can pinch and hold.  That's why

16       they would put it on the gauze and give the gauze to the

17       family.  It was completely a religious practice.

18                    THE COURT:   All right.

19                    And you're saying that if these girls when

20       examined had, or had showed evidence that the labia minora or

21       even the labia majora were indeed altered, that it was not by

22       the hands of your client; it was by others?

23                    MS. SMITH: Absolutely, yes.

24                    THE COURT:   And that's your defense?

25                    MS. SMITH: Yes.
```

1          THE COURT: And that's your position here?

2          MS. SMITH: Absolutely, yes.

3          THE COURT:   And that when these girls were given

4    a pad and were bleeding, it was because mucus was taken from

5    their clitoris.

6          MS. SMITH: My client denies that there was any

7    blood.  My client says that they use the beta iodine to clean

8    the area prior to doing anything, and they were given the pad

9    to protect their underwear from the brown beta iodine.  It was

10   not an issue with blood.

11         THE COURT:   And when the victims say that they

12   were given a shot, why were they given a shot?

13         MS. SMITH: My client tells me there was no shot

14   given.  We believe that with these young seven year olds who

15   were interviewed, that it's very obvious to us that someone

16   talked to these seven year olds beforehand, made them believe

17   that what happened was far different than it was because

18   they've reported things that did not happen; such as, a shot in

19   the leg, and that some of that influenced the way they reported

20   these events when forensically interviewed.

21         THE COURT:   And when the victims described a long

22   tool that was used to undertake this procedure, what is your

23   response to that?

24         MS. SMITH: We believe that any tool that they're

25   referring to is what would wipe the mucus that would end up on

```
 1    the gauze.
 2              THE COURT:   What tool was that?
 3              MS. SMITH: It was a long, it looked like a
 4    scraper.  I can't give a better -- it looked like a scraper,
 5    but it was not used to cut or incise.  It was used to take off
 6    that little bit of mucus, a sesame size, put on the gauze,
 7    gauze folded and given to the parents.
 8              THE COURT:   And let me ask you one more question.
 9              MS. SMITH: Sure.
10              THE COURT:   Your client is a physician?
11              MS. SMITH: Yes.
12              THE COURT:   Does your client hold any religious
13    position within the mosque?
14              MS. SMITH: My client does not hold any religious
15    title if that's what you're asking.
16              THE COURT:   I said, "position".
17              MS. SMITH: Or position, no.
18              THE COURT:   So what entitles your client to be the
19    go-to person for this procedure?
20              MS. SMITH: She's not necessarily the go-to person.
21    She --
22              THE COURT:   Well, people went to her to have this
23    done.  Whether it's what you describe or what the government
24    describes, people did come to her at this clinic, at this
25    clinic, and appointments were made for these young girls to see
```

1  her in a closed clinic to have something done.  Whether,

2  whether it is what you describe or otherwise, people came to

3  her.  Why?  Why her?

4          MS. SMITH: They came to her because she was

5  familiar with the religious procedure that was done and she was

6  willing to do it.

7          THE COURT:  People came from Minnesota to

8  Michigan to have her swipe mucus?

9          MS. SMITH: Yes, judge, and there was, it was our

10  belief that there are other women in the community who also do

11  this.  My client wasn't the go-to exclusive person.  We don't

12  know -- and that's all yet to be investigated and discovered,

13  but --

14          THE COURT:  She was the person that these victims

15  went to, that's all I mean to imply.

16          MS. SMITH: We absolutely agree that the two girls

17  from Minnesota did come.  They did see my client.  They did do

18  this religious procedure in the office.

19          THE COURT:  Again, you call it a religious

20  procedure.  Your client is a physician.  What is the

21  connection?

22          She's not -- she does not have a position within

23  this mosque.  Most women don't.

24          MS. SMITH:  Correct. Well --

25          THE COURT:  She doesn't have a religious position

1    within the mosque.  She is a physician.  You're calling it a

2    religious procedure.

3              MS. SMITH:  Right. It's not a medical --

4              THE COURT:  Tie it up for me.

5              MS. SMITH:  It's not a medical procedure, but in

6    doing this --

7              THE COURT:  It's not a medical procedure, but it's

8    done in a medical clinic.  It's done by a physician, but it's

9    not a medical procedure.

10             MS. SMITH: It does not have to be done by a

11   physician.

12             THE COURT:   But it was done by a physician in a

13   medical clinic.

14             MS. SMITH:  She happens to be a physician, yes,

15   and it was done in a medical clinic.  It was not medical

16   treatment, which is why there are no records.  There was no

17   payment, no insurance, billing, nothing along those lines. I

18   believe that my client and everyone involved just wanted it to

19   be as sanitary as possible, as clean as possible, and by being

20   in a medical facility they had access to sterilization to be

21   able to make sure that nothing would ever contaminate these

22   young ladies or contaminate any part of this procedure.

23             THE COURT:   Thank you.

24             Ms. Woodward, anything further?

25             MS. WOODWARD: No, your Honor.  You've obviously

 1    noted that the description in the criminal complaint of the

 2    medical evidence in Minnesota is considerably different than

 3    what the defendant is describing here today, and so, obviously,

 4    we disagree strongly with her characterization of what she was

 5    doing.

 6                    THE COURT:    All right.

 7                    With regard to the determination of bond or

 8    detention, as you know this court must review certain factors.

 9    Those factors were reviewed by the government in detail on the

10    record.  They are found in 18 U.S.C. 3142(g)(1) through (4).

11                    And the Court must determine the nature and

12    circumstances of the offense charged, including whether it is a

13    crime of violence or whether it involves a minor victim.

14                    With regard to the charges, and I'm only going to

15    the charges, I'm not going to anything but the allegations.

16    Clearly these charges involve minor victims.  So with regard to

17    the first factor, those go in favor of the detention.

18                    The weight of the evidence.  It seems that Ms.

19    Thompson's characterization of what went on is her client's

20    position, but we don't have any evidence with which to weigh

21    the defense.  We have no documents.  We have no statements.  We

22    have nothing.

23                    The government has witnesses.  The government has

24    statements.  The government has examining physicians.  So the

25    weight of the evidence, again, goes against the defendant.  So

1    on that factor detention seems to be, weighs in favor of

2    detention, I should say.

3            The history and characteristics of the person.

4    Clearly this defendant is a member of this community, as you

5    said, born in this country, educated in this country,

6    practicing medicine in this country, working for a local

7    hospital system for many years as an emergency room physician.

8            She does have strong community ties.

9            She does not have a criminal record.

10           So, (3)(A) goes in favor of the defendant, and she

11   clearly has no criminal record, so (A) and (B).

12           However, the nature and seriousness of the danger

13   to any person or the community is troubling to this Court,

14   because we have multiple victims who have travelled across

15   state lines, some of whom.  I don't know how many are local,

16   but we talk about Michigan victims and we talk about other

17   victims, and this gives the Court great pause.

18           The nuances -- let me go back to number 2(A)[sic].

19   The person's character.  I have issues with that more than I do

20   her community ties and the issues I have with that go to the

21   charges that this defendant may have lied to federal

22   authorities, or did lie.  The charges are that she has alleged

23   to have lied to federal authorities, given false statements to

24   a federal officer, and that's troubling to this court.

25           Whether or not it is true that she cautioned the

1    families and their children to deny that this every took place,

2    is troubling.  Now you're saying what took place was not

3    illegal, not even a medical procedure, so the Court is

4    wondering why your client would caution families and victims to

5    keep it quiet, not to mention it, not to talk about it.

6              MS. SMITH:  And, your Honor, on that my client

7    denies --

8              THE COURT:   Denies having -- okay.

9              MS. SMITH:  Yeah.  She denies that she did that.

10             THE COURT:   All right.  Well, again, the weight

11   of that denial is weak.  I mean, it's your client's position.

12   I don't have anything objective to use to weigh that.

13             Pretrial services interviewed this defendant and

14   found, as we know, at least, that she poses a risk of flight

15   and is a danger, poses a risk of danger to the community based

16   on the nature of the charges, safety concerns, etcetera.

17             I have to believe that your client is accurately

18   described in the pretrial services report with regard to the

19   findings made there, and also with the conclusions.  I do agree

20   with pretrial services that there is a preponderance of the

21   evidence that does establish her as a risk of flight,

22   notwithstanding the fact that her passport has been seized.  I

23   appreciate that it has been.

24             And I also think there's clear and convincing

25   evidence that your client poses a danger to the community.

1    With all due respect, I order detention.

2              We're going to need a date for a preliminary exam.

3              MS. SMITH:  Thank you.

4              THE COURT:   Preliminary examination?

5              THE CASE MANAGER: April 27 at 1 p.m.

6              THE COURT:  April 27 at 1 p.m.

7              MS. SMITH: Thank you.

8              THE COURT:  You're welcome.

9              MS. WOODWARD: Thank you, your Honor.

10             THE COURT:   You're welcome.

11         (At 2:40 p.m. proceedings concluded)

12                   C E R T I F I C A T E

13         I, Merilyn J. Jones, Official Court Reporter of the

14   United States District Court, Eastern District of Michigan,

15   appointed pursuant to the provisions of Title 28, United States

16   Code, Section 753, do hereby certify that the foregoing pages

17   1-39, inclusive, comprise a full, true and correct transcript

18   taken in the matter of the United States of America versus

19   Jumana Nagarwala, 17-mj-30182 on Monday, April 17, 2017.

20

21                   /s/Merilyn J. Jones
                     Merilyn J. Jones, CSR 0935, RPR
22                   Federal Official Reporter
                     231 W. Lafayette Boulevard, Suite 123
23                   Detroit, Michigan  48226

24   Date: April 21, 2017

25