UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-cr-20274 |
| Plaintiff, | Honorable Bernard A. Friedman |
| v. | MOTION TO COMPEL DISCOVERY OF FORENSIC INTERVIEWS |
| JUMANA NAGARWALA, D-1 FAKHRUDDIN ATTAR, D-2, FARIDA ATTAR, D-3, TAHERA SHAFIQ, D-4, FARIDA ARIF, D-5 FATEMA DAHODWALA, D-6 HASEENA HALFAL, D-7, and ZAINAB HARIYANAWALA, D-8 | |
| Defendants. | |
| _____/ | |

The above-captioned Defendants, by and through their respective Counsel, respectfully request that this Court enter an order requiring the Government to provide Defendants with copies of all forensic interviews produced in connection with this case. Concurrence was sought regarding the request herein, however, the government does not agree to produce copies of the forensic interviews.

1

                                              Respectfully submitted,

Dated: 7/23/2018                  /s/ Shannon M. Smith
                                              SHANNON M. SMITH
                                              Attorney for Jumana Nagarwala

Dated: 7/23/2018                  /s/ Mary Chartier
                                              MARY CHARTIER
                                              Attorney for Fakhruddin Attar

Dated: 7/23/2018                  /s/ Matthew Newburg
                                              MATTHEW NEWBURG
                                              Attorney for Farida Attar

Dated: 7/23/2018                  /s/ Jerome Sabbota
                                              JEROME SABBOTA
                                              Attorney for Tahera Shafiq

Dated: 7/23/2018                  /s/ Anjali Prasad
                                              ANJALI PRASAD
                                              Attorney for Farida Arif

Dated: 7/23/2018                  /s/ Brian M. Legghio
                                              BRIAN M. LEGGHIO
                                              Attorney for Fatema Dahodwala

Dated: 7/23/2018                  /s/ Lisa L. Dwyer
                                              LISA L. DWYER
                                              Attorney for Haseena Halfal

Dated: 7/23/2018                  /s/ Patricia A. Maceroni
                                              PATRICIA A. MACERONI
                                              Attorney for Zainab Hariyanawala

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-cr-20274 |
| Plaintiff, | Honorable Bernard A. Friedman |
| v. | BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY OF FORENSIC INTERVIEWS |
| JUMANA NAGARWALA, D-1 FAKHRUDDIN ATTAR, D-2, FARIDA ATTAR, D-3, TAHERA SHAFIQ, D-4, FARIDA ARIF, D-5 FATEMA DAHODWALA, D-6 HASEENA HALFAL, D-7, and ZAINAB HARIYANAWALA, D-8 | |
| Defendants. | |
| _____/ | |

## BACKGROUND INFORMATION

All of the above-captioned Defendants are charged by indictment with Count One, Conspiracy to Commit Female Genital Mutilation, in violation of 18 U.S.C. § 371;

D-1, D-2, D-3, D-4, and D-7 are charged with Count Two, Female Genital Mutilation, in violation of 18 U.S.C. §§ 116 and 2 regarding MV-1;

3

D-1, D-2, D-3, D-4, and D-8 are charged with Count Three, Female Genital Mutilation, in violation of 18 U.S.C. §§ 116 and 2 regarding MV-2;

D-1, D-3, and D-5 are charged with Count Four, Female Genital Mutilation, in violation of 18 U.S.C. §§ 116 and 2 regarding MV-3;

D-1 and D-6 are charged with Count Five, Female Genital Mutilation, in violation of 18 U.S.C. §§ 116 and 2 regarding MV-4;

D-1, D-2, D-3 and D-6 are charged with Count Seven, Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k). (Second Superseding Indictment[1], Doc. 153.).

During the course of the investigation, the government conducted forensic interviews on at least thirteen children. Videos made from the anogenital examinations and medical reports regarding each child were provided under a Protective Order. The children include the following: MV-1, MV-2, MV-3 (also known as MI-1); MV-4 (also known as MI-2); MV-5 (also known as MI-8); MV-6 (also known as MI-9); MI-3; MI-4; MI-5; MI-6; MI-7; MI-11; MI-12; MI-13. While some of the minors are explicitly referenced in the Second Superseding Indictment, upon

---

[1] Count Six was previously dismissed by this Court.

4

information and belief, some of the parents of the other children evaluated have received immunity or are cooperating with the government. However, discovery including the medical findings and videotaped physical examinations related to their children was still tendered to the defense.

The children interviewed ranged in age from seven years old to twenty, although the religious procedure for the girls would have taken place when they were close to seven years old. The interviews were conducted by professionals trained in forensic interviewing techniques and forensic interviewing protocols. Several of the interviewers who conducted the forensic interview have been qualified as expert witnesses and routinely testify to their expert opinions in both state and federal court. Each child was questioned about the circumstances underlying the charged offenses and the interviews were videotaped.

The defense requested copies of the videotaped interviews previously, however, the government maintains these interviews are *Jencks* material. The government does agree, however, that the United States Attorney's Office will make the videos available for review at its office. For several reasons explained below, these accommodations would

5

be insufficient for the defense and cause undue delay during trial if the videos are not provided to the defense well in advance of trial.

Further, the Court should be aware that contemporaneously with this instant case, Child Protective Services (CPS), through the Michigan Department of Health and Human Services (DHHS), filed petitions against numerous families in the community including but not limited to currently indicted parents from the Nagarwala family, the Attar family, the Dahodwalas and the Arifs.[2] In the child protective proceedings, DHHS petitioned to terminate the parental rights of the parents to the children in this case, and other families who are not currently indicted, for the alleged female genital mutilation procedures.

During the course of the Michigan state proceedings, the Attorney General **did** provide copies of the videotaped forensic interviews as discovery. Based on information from the Attorney General, the copies of the forensic interviews that were provided to counsel in the CPS cases came directly from the federal government, who then provided them to the Attorney General's office. At the time the government provided

---

[2] State court proceedings were also filed in Minnesota against the Halfal and Hariyanawala families, however, it is unknown if the forensic interviews were provided as discovery to counsel in those matters.

copies to the Attorney General's office, the Government was aware the DVDs were going to be provided to defense counsel pursuant to court order. As such, Dr. Nagarwala, for example, was provided copies of the forensic interviews regarding the following children through her attorney, who are also involved in this case: MV-4/MI-2; MV-3/MI-1; MV-5/MI-8; MV-6/MI-9; MI-3; MI-4; MI-5; MI-6; MI-7. The Attars, for example, were provided discovery through their respective attorneys of the forensic interviews of MV-3/MI-1; MV-6/MI-9; MI-3; MI-4; MI-5; MI-6; MI-7. The lawyers for the Dahodwalas and Arifs were provided the interviews for the children of their respective clients. The forensic interviews were released as discovery under Protective Orders with several provisions that required Counsel to maintain the videos confidentially; to maintain the videos in the attorneys' possession at all times or to keep them secure in their offices; to not copy, download or duplicate the videos in any way; and finally, to return the videos at the conclusion of the state proceedings. At this time, pursuant to the Protective Orders entered in each case, all of the videos provided in state court as discovery have been returned to the Attorney General.

In the course of preparing for the trials in state court, several of the indicted defendants, through their attorneys, consulted with expert witnesses in forensic psychology who have specific expertise in forensic interviewing techniques and memory and suggestibility. These experts, and others, will be called to testify in the federal trial. Additionally, the experts the defense will consult with will assist in cross-examination of the government's forensic interviewer witnesses. As such, copies of all of the forensic interviews are needed in this case based on the following arguments.

## ARGUMENT

### I. The accommodations proposed by the government are insufficient for this instant case.

The government did propose that the defense can have access to the videos of the forensic interviews in their office. Unlike most cases, however, the sheer volume of material makes this unhelpful. The instant case involves at least thirteen children who were interviewed, and at least one of them was interviewed more than once. Based on the videos seen by Undersigned Counsel in the CPS matter for Dr. Nagarwala and the Attars, while most of the videos are approximately an hour long, there is at least one that is nearly two and a half hours.

The defense in this matter intend to collectively consult with at least two experts who are based out-of-state and one expert from outside of the country. One such expert is only available August 27 and August 28 to review the videos and consult with Undersigned Counsel. It would be impossible and cost-prohibitive for those experts to travel to Michigan, spend days on end at the prosecutor's office analyzing the videos, and be able to adequately prepare and consult with the multiple attorneys involved in this case, particularly considering the number of hours of child interview statements to review.

Obtaining copies of the videos will allow Defense Counsel to review the videos with each client, to view the videos multiple times in preparation for trial (as there are significant impeachment from some of the interviews based on the CPS proceedings), and to show the videos to experts. An offer of proof regarding the need for expert testimony is contained in Section II. It would be much more cost effective to not require out-of-state and foreign experts to travel to Detroit every time they needed to review the videos.

Further, although it has not been suggested yet, obtaining transcripts of the videos in this particular case would be insufficient as

well. The interviews are critical to the defense in terms of showing the emotion, affect of the children/teenagers, and demeanor that can only be seen by watching the videos. For example, one of the children in her interview answers questions rhetorically. Many ask questions in a way that shows their clear confusion over the issue at hand, particularly because the interviewers are using terms and words the children did not know. It is imperative the experts can visualize the demeanor and voice inflection of the children and teenagers during the interviews. These things, for example, cannot be derived from a written transcript.

> II. **Expert testimony will be necessary at trial regarding the forensic interviews. If the video is not released until after each child testifies, the trial will be delayed due to adjournments necessary for the defense to consult with forensic experts, particularly due to the volume of material.**

Based on the knowledge from the release of videoed forensic interviews in the state CPS court proceedings, the Defendants in this instant case intend to present expert testimony at trial. The amount of time for experts to prepare and consult with the defense would cause adjournments and delays that would defeat judicial economy, particularly due to the volume of materials, the number of videos, and the length of the interviews. Some of the interviews contain numerous

topics that experts will need to explain at trial. Further, pursuant to Rule 16(b)(1)(C), the defense prefers to tender summaries of the various expert opinions to the prosecution in advance of trial.

In this instant case, the defense intends to introduce expert testimony based on scientific research, which has been conducted in the fields of child development, psychology, and sociology on the suggestibility of children and teenagers and factors influencing the accuracy of witness reports. The testimony will require an in-depth analysis of each interview. The testimony is likely to include the importance of adherence to the forensic interview protocols that were supposedly used in the investigation of this case. The experts will rely on peer reviewed articles and books in this field, which are recognized in the scientific community. Further, the experts would testify about known developmental and psychological principles that explain how certain factors can and do influence children and adolescents to make unreliable and/or inaccurate statements concerning their memory of events to interviewers and in Court.

As an offer of proof, the defense offers the following topics that experts may opine on during the federal trial in this instant case, once the experts have had the opportunity to review the videos:

A. The importance of following recognized forensic interview protocols; why they were created; and why they are essential to obtain the most reliable information from children and teenagers during interviews;

B. How forensic interviewing protocols were not followed at times during interviews conducted in this instant case;

C. Information about suggestibility and memory that are not common knowledge to lay people, including several factors found in research to have a high correlation to inaccurate statements by adolescents about events that have been influenced by improper interviewing techniques;[3]

D. Why alternative hypothesis testing is a critical component of the forensic interview protocols and process and how some of the interviewers failed to explore alternative hypotheses in these interviews; For example, an alternative hypothesis that was not tested was whether the girls were not "mutilated" in this case, but rather underwent a harmless religious procedure.

E. Known developmental and psychological principles that explain how child interviewers and certain social factors can

---

[3] See, e.g., Barbara Kaban and Ann E. Tobey, "When Police Question Children: Are Protections Adequate?" 1 J.Center for Child and Cts. 151 (1998); Daniel Hyman, "Interviewing Children in Child Custody Evaluations," 36 Fam. and Conciliation Courts Rev. 466 (Oct. 1998); John E.B. Myers, Karen J. Saywitz and Gail S. Goodman, "Psychological Research on Children as Witnesses: Practical Implications for Forensic Interviews and Courtroom Testimony," 28 Pac. L.J. 3, 7 (Fall 1996); Dana D. Anderson, "Assessing the Reliability of Child Witness Testimony in Sexual Abuse Cases," 69 S. Cal.L.R. 2117 (September 1996).

   and do influence children and adolescents to make inaccurate statements concerning events to various interviewers and in court;

F. How scientists have long recognized that memory is a constructive process and that recall is not simply retrieval, but a reconstruction, in which aspects of the content of previously presented material are woven into a coherent whole, with the aid of preexisting knowledge; It is critical in the evaluation of memory testimony to understand that the way questions are asked and the interviewer's reactions can shape the descriptions adolescents give of past events. This contributes to why the experts will need to see how questions are presented and the physical/emotional reaction to the same.

G. The concept of source monitoring to explain how what one reports as the "truth" may be the result of familiarity with ideas gleaned from a variety of external sources other than direct personal experience, such as being questioned or overhearing conversations; In this instant case, for example, at least one girl repeatedly stated that she had never had a procedure, however, when interviewers essentially told her they "knew it had happened," she acquiesced to their belief.

H. That there is ease with which an interviewer's expectations, misperceptions and manner of questioning can distort and alter a child's statements about an event;

I. That once memories have been altered or implanted, even through improper questioning during a forensic interview, there is no way for experts or any others to distinguish between true and false reports of events or details reported by children/adolescents.

J. The impact of various interview circumstances and techniques such as repeated interviewing and repeated questions can dramatically influence the statements by a

13

        child in an interview; This is certainly critical to one child who stated more than one hundred times during her interview that she did "not know" or did "not remember" a procedure. After literally badgering the child, however, she conceded that something may have happened, and became hysterically upset that there may be something wrong with her body.

K.    That many interview practices are sufficiently suggestive or coercive to alter irremediably the perceptions of a child or adolescent witness; This is critical to one child in this case who initially had absolutely no recollection of any procedure done to her genitalia. After conversations with outside sources, the child suddenly came to remember having a procedure and was re-interviewed by a forensic interviewer. Naturally, based on the biased questions she was asked, the procedure was described with inaccurate information.

L.    Finally, research that demonstrates that children can be convinced of a different physical touch than that which they actually experienced.

As the Court may imagine, to prepare experts to testify about each of these subjects and to analyze the many videos in this case, particularly to study each question and answer, would cause enormous delay mid-trial.

## CONCLUSION

Throughout this case, the Court has routinely granted discovery with Protective Orders in place. For example, the Court has released copies of the anogenital examinations under a Protective Order showing

14

the colposcope examinations on the children involved and their medical findings. All Defense Counsel have abided by the terms of the Protective Order and would continue to do the same if a Protective Order were entered governing the videos of the forensic interviews.

Respectfully submitted,

Dated: 7/23/2018  /s/ Shannon M. Smith
SHANNON M. SMITH
Attorney for Jumana Nagarwala

Dated: 7/23/2018  /s/ Mary Chartier
MARY CHARTIER
Attorney for Fakhruddin Attar

Dated: 7/23/2018  /s/ Matthew Newburg
MATTHEW NEWBURG
Attorney for Farida Attar

Dated: 7/23/2018  /s/ Jerome Sabbota
JEROME SABBOTA
Attorney for Tahera Shafiq

Dated: 7/23/2018  /s/ Anjali Prasad
ANJALI PRASAD
Attorney for Farida Arif

Dated: 7/23/2018  /s/ Brian M. Legghio
BRIAN M. LEGGHIO
Attorney for Fatema Dahodwala

Dated: 7/23/2018  /s/ Lisa L. Dwyer
LISA L. DWYER
Attorney for Haseena Halfal

Dated: 7/23/2018  /s/ Patricia A. Maceroni
PATRICIA A. MACERONI
Attorney for Zainab Hariyanawala

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification to parties enrolled through the ECF system. A hard copy has been mailed via the United States Postal Service to those who are not enrolled.

/s/ Shannon M. Smith
SHANNON M. SMITH
Attorney for Jumana Nagarwala
Smith Blythe, PC
1668 South Telegraph Road
Suite 140
Bloomfield Hills, Michigan 48302
(248) 636-2595
attorneyshannon@gmail.com