# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-cr-20274 |
| Plaintiff, | Honorable Bernard A. Friedman |
| v. | **MOTION TO DISMISS COUNTS ONE, TWO, THREE, FOUR, AND FIVE** |
| JUMANA NAGARWALA, D-1, FAKHRUDDIN ATTAR, D-2, and FARIDA ATTAR, D-3, | |
| Defendants. | |

---

Jumana Nagarwala, M.D., Fakhruddin Attar, M.D., and Farida Attar, move this Court to dismiss Counts 1, 2, 3, 4, and 5 of the Indictment because Congress lacked the authority to enact 18 U.S.C. § 116(a), as explained in the accompanying brief. Concurrence from the government was sought for the instant motion but denied.

Respectfully submitted,

Dated: 7/27/2018          /s/ Shannon M. Smith
                         SHANNON M. SMITH
                         Attorney for Jumana Nagarwala


Dated: 7/27/2018          /s/ Molly Blythe
                         MOLLY BLYTHE
                         Attorney for Jumana Nagarwala

1

Dated: <u>7/27/2018</u>                    <u>/s/ Mary Chartier</u>
                                           MARY CHARTIER
                                           Attorney for Fakhruddin Attar

Dated: <u>7/27/2018</u>                    <u>/s/ Matthew Newburg</u>
                                           MATTHEW NEWBURG
                                           Attorney for Farida Attar

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

v.

JUMANA NAGARWALA, D-1,
FAKHRUDDIN ATTAR, D-2,
and
FARIDA ATTAR, D-3,

             Defendants.

No. 17-cr-20274

Honorable Bernard A. Friedman

**BRIEF IN SUPPORT OF MOTION TO DISMISS COUNTS ONE, TWO, THREE, FOUR, AND FIVE**

Count 1 of the indictment charges Jumana Nagarwala, M.D., Fakhruddin Attar, M.D., Farida Attar, and others with conspiracy to commit female genital mutilation (FGM) in violation of 18 U.S.C. § 371. Counts 2, 3, 4, and 5 charge FGM in violation of 18 U.S.C. § 116(a).[1] Dr. Nagarwala is charged in counts 2, 3, 4, and 5. Dr. Attar is charged in counts 2 and 3. Mrs. Attar is charged in counts 2, 3, and 4. Counts 1, 2, 3, 4, and 5 should be dismissed because Congress lacked the authority to enact 18 U.S.C. § 116(a), as explained in detail below.

---

[1] The government also includes the aiding or abetting statute, 18 U.S.C. § 2 as part of the indictment for counts 2, 3, 4, and 5.

<u>Analysis</u>

I. **Congress lacked authority to enact 18 U.S.C. § 116(a); thus, the female genital mutilations charges must be dismissed.**

Congress lacked the authority to enact 18 U.S.C. § 116(a) for a number of significant reasons.

1. Congress could not have enacted 18 U.S.C. § 116(a) pursuant to Section 5 of the Fourteenth Amendment. Section 5 of the Fourteenth Amendment only applies to state action. None of the accused are state actors.

2. Congress could not have enacted 18 U.S.C. § 116(a) pursuant to a treaty because 18 U.S.C. § 116(a) regulates private conduct and the most applicable treaties are limited to acts occurring at the hand of state or government officials. Thus, 18 U.S.C. § 116(a) was not enacted pursuant to a power granted by the ratification of a treaty.

3. Congress could not have enacted 18 U.S.C. § 116(a) pursuant to Section 8 of Article I of the Constitution, specifically the Commerce Clause. The statute was not enacted to regulate an activity having a substantial relationship to interstate commerce.

Notably, FGM is not an economic or commercial activity. Instead, 18 U.S.C. § 116(a) is a criminal statute that has nothing to do with commerce or any sort of economic enterprise.

4. And, finally, Congress could not have enacted 18 U.S.C. § 116(a) pursuant to the Necessary and Proper Clause, as the clause is not an independent power. See *M'Culloch v. Maryland*, 17 U.S. 316, 323-324 (1819). It only grants Congress the authority to enact legislation necessary to its enumerated powers. *United States v. Comstock*, 560 U.S. 126, 133 (2010).

Respectfully, because Congress did not have the power to enact 18 U.S.C. § 116(a), counts 1, 2, 3, 4, and 5 must be dismissed.

## A. History of 18 U.S.C. § 116(a)

The law proscribing FGM, 18 U.S.C. § 116(a), was passed in 1996 and states the following:

> Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned for not more than 5 years, or both.

Before the passage of 18 U.S.C. § 116(a) in 1996, the first attempt to federally criminalize the practice of FGM occurred on September 14,

1993, when Congresswoman Patricia Schroeder introduced the Women's Health Equity Act of 1993. H.R. 3075, 103d Cong. (1993). Although the stated purpose of the Equity Act was to promote greater equity in the delivery of health care services to American women, the Act also included a provision criminalizing the practice of FGM. *Id.* at Subtitle M. (Exh. A.) Yet after its introduction, the Equity Act was inexplicably tabled after being referred to the House Judiciary Committee. No report was ever issued concerning the proposed criminal statute. The same fate lay with Congresswoman Schroeder's second and third attempts at enacting legislation that would federally criminalize the practice of FGM. The Federal Prohibition of Female Genital Mutilation Acts of 1993 and 1995 were both similarly tabled without explanation after being referred for committee reports. (Exh. B; Exh. C.)

At the same time as Congresswoman Schroeder was working on legislation in the House of Representatives, Senator Harry Reid began to push for legislation criminalizing FGM in the Senate. On September 21, 1994, Senator Reid introduced a Senate resolution condemning FGM, and when introducing the resolution, indicated that he would be proposing legislation in the immediate future to federally criminalize

the practice. See S. Res. 263; Cong. Rec., 103d Cong., 2d. Sess. at S13100-01 (Sept. 21, 1994) (statement of Sen. Reid). (Exh. D; Exh. E.)

On October 5, 1994, Senator Reid introduced to the Senate the Federal Prohibition of Female Genital Mutilation Act of 1994, which was virtually identical to the legislation proposed by Congresswoman Schroeder. S. 2501, 103d Cong. (1994). (Exh. F; Exh. G.) Senator Reid's Act was referred to the Senate Judiciary Committee, but like the legislation that was proposed by Congresswoman Schroeder in the House, no reports were ever issued and the Act was never put up for a vote. This same scenario occurred when Senator Reid proposed the Federal Prohibition of Female Genital Mutilation Act of 1995. S. 1030, 104th Cong. (1995). (Exh. H; Exh. I.)

After his 1995 Act was tabled, Senator Reid changed course in his quest to criminalize FGM. Instead of proposing standalone legislation, he began submitting amendments to pending omnibus and appropriations bills and sought to have the language of the previously failed Acts inserted into more voluminous legislation packages. His first attempt occurred on September 20, 1995, when he proposed a Senate amendment to the Foreign Operations, Export Financing, and Related

Appropriations Act of 1996. S. Amdt. 2711, 104th Cong. (1995). (Exh. J; Exh. K.) But the amendment did not survive the conference committee and was not incorporated into the final appropriations act.

On March 12, 1996, Senator Reid again submitted a Senate amendment to the Omnibus Consolidated Rescissions and Appropriations Act of 1996. S. Amdt. 3477, 104th Cong. (1996). (Exh. L.) With this attempt, however, congressional findings were included within the proposed language. Specifically, the Senate amendment, in relevant part, stated:

(b) Congress finds that –

(1) the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States;
(2) the practice of female genital mutilation often results in the occurrence of physical and psychological health effects that harm the women involved;
(3) such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional;
(4) the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control;
(5) the practice of female genital mutilation can be prohibited without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or under any other law; and
(6) Congress has the affirmative power under section 8 of article I of the Constitution, as well as under section 5 of

the Fourteenth Amendment to the Constitution, to enact
such legislation.

(c) It is the purpose of this section to protect and promote the
public safety and health and activities affecting interstate
commerce by establishing Federal criminal penalties for
the performance of female genital mutilation. [*Id.*]

Notably, the congressional record is silent as to the reason behind
the addition of the congressional findings and statement of purpose
language added to the statute and void of any explanation justifying the
additions. Nevertheless, Senator Reid's amendment suffered the same
fate as his prior attempts, and although passed by the Senate, the
amendment did not survive the conference report.

On April 29, 1996, Senator Reid again proposed legislation to
criminalize the practice of FGM via a Senate amendment to the
Immigration Control and Financial Responsibility Act of 1996. S. Amdt.
3865, 104th Cong. (1996). (Exh. M.) This time the congressional
findings also included the Necessary and Proper Clause and the Treaty
Clause as constitutional grounds upon which the legislation could be
enacted. In the new amendment the "purpose of this section" language
found in subsection (c) of the previous amendment was omitted, thereby
removing from the statute its sole reference to interstate commerce.

As was the case with the prior amendment, no explanation for the additions and deletion are found within the congressional record. When addressing the Senate, however, Senator Reid, while lamenting that he had been unable to get legislation passed because of "procedural reasons," shed some light on the bare-bones legislative findings when Senator Reid, after indicating that his colleagues did not think appropriate to pass a criminal law via an appropriations bill, remarkably bemoaned to Congress, "I do not think this is something that calls for formalities." (Exh. N.)

Nevertheless, and although Senator Reid himself seemingly acknowledged the hollow legislative history of the proposed federal criminal law, the amendment became law when the related Omnibus Consolidated Appropriations Act of 1997 was pushed through the House and Senate. (Exh. O.) The self-stated purpose of the 750-page Omnibus package was to make appropriations for the Departments of Commerce, Justice, and State; the Judiciary; and related agencies for the fiscal year ending September 30, 1997, and for "other purposes." *Id.* One such other purpose, found in section 645 of the Act, was to federally criminalize the practice of FGM.

As the legislative history of 18 U.S.C. § 116(a) makes clear, no committee report exists with respect to the federal criminal law. Similarly, the law was never debated on the floor of either chamber of Congress nor was there ever any legislative hearing addressing the justification or need for the federal law. Instead, all that exists is the criminal statute itself, accompanied by unsupported and unverified "legislative findings" that seem to have originated without debate or deliberation. Perhaps this is because, in the words of Senator Reid, the "formalities" of legislating need not be adhered to when dealing with a topic like FGM.

Nonetheless, the statute has stood unchallenged, and unused, for over a decade until the federal government initiated this case before this Court. This Court is aware that the use of this statute for criminal prosecution is the first of its kind and, as such, the constitutionality of 18 U.S.C. § 116(a) is a matter of first impression. As will be described below, the enactment of 18 U.S.C. § 116(a) impermissibly expanded the scope and authority of the federal government's powers beyond constitutional parameters, and the current prosecution cannot proceed without violating the Constitution of the United States.

## B. Congress lacked authority to enact 18 U.S.C. § 116(a).

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States,* 134 S. Ct. 2077, 2086 (2014). "The States have broad authority to enact legislation for the public good – what [the Supreme Court has] often called a 'police power.'" *Id.* (citing *United States v. Lopez*, 514 U.S. 549, 567 (1995)). The federal government, by contrast, has no such authority and "can exercise only the powers granted to it[.]" *McCulloch*, 17 U.S. at 405. Accordingly, "[u]nder our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States." *Lopez*, 514 U.S. at 561 n. 3 (internal citation omitted).

Here, Congress specifically invoked four sources of constitutional authority to enact 18 U.S.C. § 116(a). In the companion statutory note to Section 116(a), Congress concluded, albeit incorrectly, that "Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth amendment, as well as under the treaty clause, to the Constitution to enact such legislation." As will

be demonstrated below, none of the sections invoked by Congress provide a constitutional basis for Section 116(a)'s enactment and, therefore, counts 1 through 5 of the Second Superseding Indictment should be dismissed.

### C. The Necessary and Proper Clause does not provide independent authority to enact legislation.

The Constitution empowers Congress "[t]o make all laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Because the Necessary and Proper Clause is not a freestanding grant of congressional power, but rather "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are convenient, or useful or conducive to the authority's beneficial exercise[,]" *Comstock*, 560 U.S. at 133-134 (internal citations and quotation marks omitted), the Necessary and Proper Clause is not an independent basis upon which Congress may enact legislation. Because none of the stated powers are applicable to 18 U.S.C. § 116(a), the Necessary and Proper

Clause cannot provide a constitutional basis for the enactment of the legislation.

### D. 18 U.S.C. § 116(a) is an unconstitutional exercise of Congress' power under Section 5 of the Fourteenth Amendment.

Section 1 of the Fourteenth Amendment provides, in relevant part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Section 5 of the Fourteenth Amendment states, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Section 5 of the Fourteenth Amendment is "a positive grant of legislative power" to Congress. *Katzenbach v. Margan*, 384 U.S. 641, 651 (1966). However, "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell*, 400 U.S. 112, 128 (1970) (opinion of Black, J.).

"[S]everal limitations inherent in § 5's text and constitutional context have been recognized since the Fourteenth Amendment was adopted." *United States v. Morrison*, 529 U.S. 598, 619 (2000). "These

limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government." *Id.* at 620.

"Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action." *Id.* at 621. The United States Supreme Court has consistently reaffirmed this principle. In *Civil Rights Cases*, 109 U.S. 3, 11 (1883), the Court stated that an "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth A]mendment." In *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948), the Court held that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." And, notably, "It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority." *United States v. Guest*, 383 U.S. 745, 755 (1966) (opinion of Stevens, J.); see also *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 352-355 (1993) (O'Connor, J., dissenting).

Here, it is indisputable that 18 U.S.C. § 116(a) is an attempt to criminalize private conduct, given that the statute regulates conduct

where the actor is not acting under color of state authority. For this reason, Congress' power under Section 5 of the Fourteenth Amendment does not extend to the enactment of 18 U.S.C. § 116(a).

The United States Supreme Court has previously rejected Section 5 of the Fourteenth Amendment as a basis to criminalize private conduct. In *United States v. Harris*, 106 U.S. 629 (1883), the United States Supreme Court considered the criminal provisions of Section 2 of the Civil Rights Act of 1871 (17 Stat. 13), also known as the Ku Klux Klan Act. The criminal provision of Section 2 provided that "if two or more persons in any state or territory conspire or go in disguise upon the highway or on the premises of another for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any state or territory from giving or securing to all persons within such state or territory the equal protection of the laws, each of said persons shall be punished . . . ." *Harris*, 106 U.S. at 629.

The legislative history of the Ku Klux Klan Act is well-known, and a major factor motivating the Act was the belief of the 1871 Congress

that "the state authorities had been unable or unwilling to protect the constitutional rights of individuals or to punish those who violated these rights." *Patsy v. Bd. Of Regents of State of Florida*, 457 U.S. 496, 505 (1982). Despite Congress' concerns, however, the Supreme Court rejected Section 5 of the Fourteenth Amendment as a basis for reaching the private conduct proscribed by the Act. *Harris*, 106 U.S. at 637-640.

Quoting the decision of Justice Bradley, sitting as a circuit court judge, the Supreme Court held that Section 5 "is a guaranty of protection against the acts of the state government itself":

> [T]he power of Congress . . . to legislate for the enforcement of such a guaranty, does not extend to the passage of laws for the suppression of crime within the states . . . . The enforcement of the guaranty does not require *or authorize* congress to perform "the duty that the guaranty itself supposes it to be the duty of the state to perform, and which it requires the state to perform." [*Harris*, 109 U.S. at 638 (quoting *United States v. Cruikshank*, 25 F. Cas. 707, 710 (C.C.D. La. 1874) (No. 14897), *aff'd*, 92 U.S. 542 (1875) (emphasis added)).]

In the *Civil Rights Cases*, 109 U.S. 3 (1883), decided later that same year, the Supreme Court considered the constitutionality of the first two sections of the Civil Rights Act of 1875 (18 Stat. 335). That law provided all persons in the United States the right to "the full and equal enjoyment of the accommodations, advantages, facilities, and privileges

of inns, public conveyances on land or water, theaters, and other places of public amusement" regardless of race, color, or previous conditions of servitude. *Id.* Again, the purpose of the legislation was manifest from its well-known legislative history. Throughout the course of extended debates on the law, Congress repeatedly heard that the states were failing to enforce then-existing common-law and statutory rights of African-Americans.

The Supreme Court, however, found the first two sections of the 1875 Act unconstitutional. *Civil Rights Cases*, 109 U.S. at 26. The Court noted that Section 1 of the Fourteenth Amendment was "prohibitory in its character, and prohibitory upon the States." *Id.* at 10. In considering the scope of Section 5, the Supreme Court noted that the "power given to Congress to legislate [was] for the purpose of carrying such prohibition into effect." *Id.* at 11. But the statute there, despite its legislative history demonstrating a failure by the states to protect the rights of African-Americans, did not "carry such prohibition into effect" because it did not attempt to correct improper *state* action. *Id.* Thus, the Court concluded, the first two sections of the statute were "not corrective legislation" because they were "primary and direct . . .

18

tak[ing] immediate and absolute possession of the subject of the right of admission to inns, public conveyances, and places of amusement." *Id.* at 19.

Here, Congress' claim that it had authority to enact 18 U.S.C. § 116(a) pursuant to Section 5 of the Fourteenth Amendment is false because there is no indication that the statute criminalizing FGM was enacted to rectify any type of improper state action. As the *Civil Rights Cases* and *Harris* make clear, even if there had been actual evidence of the states being unable or unwilling to condemn certain behaviors, Section 5 of the Fourteenth Amendment does not allow for the federal government to take it upon itself to criminalize private conduct.

More recently, in *Morrison*, 529 U.S. at 625, the Supreme Court reaffirmed its holdings of *Harris* and the *Civil Rights Cases* and the principle that Congress' power to enforce Section 1 of the Fourteenth Amendment's prohibitions does not extend to passing laws against private conduct. The Court emphatically stated, "We accordingly have no hesitation in saying that it would take more than the naked dicta contained in Justice Clark's opinion, when added to Justice Brennan's opinion, to cast any doubt upon the enduring vitality of the *Civil Rights*

*Cases* and *Harris*." *Id*. at 624. Thus, binding authority necessitates the conclusion that 18 U.S.C. § 116(a) exceeded Congress' Section 5 power because the law is "directed exclusively against the action of private persons, without reference to the laws of the State, or their administration by her officers." *Harris*, 106 U.S. at 640.

### E.18 U.S.C. § 116(a) is an unconstitutional exercise of Congress' power under the treaty power.

"In the United States, the word treaty is reserved for an agreement that is made 'by and with the Advice and Consent of the Senate.'" Congressional Research Service of the Library of Congress, *Treaties and Other International Agreements: The Role of the Senate*, S. Prt. No. 106-71, 106th Cong, 2d Sess. at 1 (2001) (quoting U.S. Const., Art. II, § 2, cl. 2). "Signing a treaty serves to 'authenticat[e]' its text but 'does not establish [the signing party's] consent to be bound.'" *United States v. Yousef*, 327 F.3d 56, 94 n. 28 (2d Cir. 2003) (quoting Ian Brownlie, *Principles of Public International Law* 610-11 (5th ed. 1999). Consequently, the Senate must ratify a treaty before the United States becomes a party to it, and only ratification of the treaty causes the treaty to become binding on the signing party. *Id*. In the United States, ratification occurs when two-thirds of the members of the

Senate present vote in favor of ratifying a signed treaty presented by the Executive. U.S. Const. Art II, § 2, cl. 2.

With regard to 18 U.S.C. § 116(a), Congress did not specify within its findings what specific treaty it claimed granted Congress the affirmative power to enact the criminal statute. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104-208, 110 Stat. 3009, 30 Sept. 1996, at Sec. 645. Proponents of 18 U.S.C. § 116(a), however, within the congressional record, referred to the practice of FGM as both a "violation of a person's human rights" and also "comparable to torture." *See* Cong. Rec., 103d Cong., 2d. Sess. at S13100-01 (Sept. 21, 1994) (statement of Sen. Reid).[2] As such, Congress' representation that it had authority to enact the statute pursuant to the treaty power is reviewed under the basis that this representation was premised upon treaties that originated as United Nations (UN) international human rights instruments.

"The treaty power [however,] does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the

---

[2] Similar representations have been made by the government in connection with this instant prosecution. *See* Criminal Complaint, Doc. 1, PAGE ID # 4 ("According to the World Health Organization (WHO), FGM is an internationally recognized violation of human rights of girls and women.").

President, not Congress, 'to make Treaties.'" *United States v. Lara*, 541 U.S. 193, 201 (2004) (quoting U.S. Const., Art. II, § 2, cl. 2). Nevertheless, the Supreme Court has noted, that treaties made pursuant to Article II can authorize Congress to deal with "matters" with which otherwise "Congress could not deal." *Id.* (quoting *Missouri v. Holland*, 252 U.S. 416, 433 (1920)). Accordingly, Article II and the Necessary and Proper Clause, collectively, empower Congress to enact laws necessary and proper to effectuate a treaty made pursuant to Article II. *See Holland*, 252 U.S. at 432.

The United States, in turn, has ratified three of the nine "core" UN human rights instruments. (Exh. P.) For the purposes of this motion, if this Court accepted the government's contention that FGM is a human rights violation or, as stated by Senator Reid, "comparable to torture," of the three ratified treaties, two could be applicable to this instant case: the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) and the International Covenant on Civil and Political Rights (ICCPR). (Exh. Q, Exh. R.)

The CAT recognizes obligations under the United Nations Charter to "promote universal respect for, and observance of, human rights and fundamental freedoms." See CAT, pmbl. The preamble to the CAT announces the treaty's broad purpose of "mak[ing] more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." *Id.* Similarly, the ICCPR is an instrument guaranteeing "a broad spectrum of civil and political rights, rooted in basic democratic values and freedoms, to all individuals within the territory or under the jurisdiction of the States Party without distinction of any kind, such as to race, gender, ethnicity, et cetera." Senate Comm. on Foreign Relations Report on the Int'l Covenant on Civil and Political Rights, S. Exec. Rept. No. 102-23, at 1 (1992). (Exh. S.) The third human rights instrument that has been ratified by the United States, entitled the "International Convention of the Elimination of All Forms of Racial Discrimination," is inapplicable to the matter before the Court.

When courts have had the opportunity to consider whether legislation enacted pursuant to the treaty power impermissibly exceeded bounds of congressional authority, courts have recognized that

the legislation must constitute a means that is rationally related to the implementation of the enumerated power. See *Comstock*, 560 U.S. at 134 ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [courts] look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.").

In *United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998), for example, the United States Court of Appeals for the Second Circuit applied the rational relationship test in upholding the constitutionality of the Hostage Taking Act, which was enacted to implement the Hostage Taking Convention. In *Lue*, the defendant claimed that the Hostage Taking Act strayed too far from the bounds of the Hostage Taking Convention in defining a "hostage taker." *Id.* at 82. The Hostage Taking Convention defined a hostage taker as follows:

> "Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage, [is a hostage taker]." [*Id.* (quoting Hostage Taking Convention, art. 1).]

The Hostage Taking Act, on the other hand, defined a hostage taker in a slightly different manner, providing, among other things, an arguably broader definition of "third party":

> "[W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so [is a hostage taker]." [*Id.* at 81-82 (quoting 18 U.S.C. § 1203(a)).]

The Second Circuit ultimately held that the differences in language between the treaty and its implementing legislation did not mean that one lacked a rational relationship to the other. *Id.* at 84. Instead, because the Act tracked the language, the differences in the language were, therefore, not material. *Id.* The Second Circuit found a rational relationship between the Hostage Taking Convention and the Hostage Taking Act. *Id.*

The United States Court of Appeals for the Eleventh Circuit in *United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) conducted a similar analysis when considering whether there existed a rational relationship between the Torture Act and the CAT. In *Belfast*, the

defendant argued that the Torture Act was invalid because its definition of torture swept more broadly than that provided by the CAT. *Id.* at 803. In determining whether the Torture Act bore a rational relationship to the CAT, the Eleventh Circuit, relying on *Lue*, also focused its analysis on whether the differences in language between the treaty and legislation were material. *Id.* at 806.

> The CAT defines "torture" as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or third person information or a confession, pushing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. [CAT, art. 1(1).]

The Torture Act, in turn, defines "torture" as:

> [A]n act committed by person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control. [18 U.S.C. § 2340(1).]

In holding that the Torture Act bore a rational relationship to the CAT, the Eleventh Circuit explained:

Notably, the existence of slight variances between a treaty and its congressional implementing legislation do not make the enactment unconstitutional; identicality is not required. Rather, as the Second Circuit held in *Lue*, and as we echoed in [*United States v. Ferreira*, 275 F.3d 1020 (11th Cir. 2001)], legislation implementing a treaty bears a "rational relationship" to that treaty where the legislation "tracks the language of the [treaty] in all *material* respects." [*Id.* at 806 (quoting *Lue*, 134 F.3d at 84).]

In contrast to the prior holdings, here, Congress could not have enacted 18 U.S.C. § 116(a) pursuant to either the CAT or ICCPR because 18 U.S.C. § 116(a) regulates private conduct. Both the CAT and ICCPR are limited to acts occurring at the hand of state or government officials; thus, 18 U.S.C. § 116(a) falls outside the scope of both treaties.

As previously indicated, to meet the definition of "torture" under the CAT, the severe pain or suffering must have been **"inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."** CAT, art. 1(1) (emphasis added). Similarly, Article 16(1) of the CAT requires State Parties to prevent "acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article I, **when such acts are committed by or at the instigation of or with the consent or acquiescence of a public**

official or other person acting in an official capacity." *Id.* at art. 16(1) (emphasis added).

Thus, "the [CAT] applies only to torture that occurs in the context of governmental authority, excluding torture that occurs as a wholly private act or, in terms more familiar in U.S. law, it applies to torture inflicted 'under color of law.'" S. Exec. Rep. No. 101-30, at 14 (1990).[3] (Exh. T.)  Consequently, 18 U.S.C. § 116(a) could not have been enacted as a means to implement the CAT because the statute does not require the proscribed conduct to have been committed by a person acting under the color or law. This constitutes a material distinction between the treaty and 18 U.S.C. § 116(a).

Similarly, Article 7 of the ICCPR states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." The ICCPR is more expansive than the CAT given that the ICCPR does not provide limiting definitions for the terms "torture" or "cruel, inhuman or degrading punishment." Nevertheless, the ICCPR was ratified with the reservation that Article 7's prohibition against cruel, inhuman, or degrading treatment be limited to conduct prohibited

---

[3] This interpretation of the CAT is consistent with the Torture Act, 18 U.S.C. §§ 2340-2340A, passed on April 30, 1994, which defines "torture," in part, as "an act committed by a person acting under the color of law[.]"

by the Fifth, Eighth, and Fourteenth Amendments. See S. Exec. Rep. No. 102-23, at 7, 12 (1992). In explaining the necessity of the reservation, the Senate Committee on Foreign Relations made clear that the United States interpreted its "obligations under Article 7 of the Covenant consistently with those [the United States had] undertaken in the Torture Convention." *Id.* at 12.

Significantly, a private individual cannot deprive another of rights secured by the Fifth, Eighth, or Fourteenth Amendments. Instead, and consistent with the CAT, government or state action is required. See *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619 (1991). "The Constitution structures the National Government, confines its actions, and, in regard to certain individual liberties and other specified matters, confines the actions of the States." *Id.*

Although courts are to interpret treaties so as to give a "meaning consistent with the shared expectations of the contracting parties[,]" *Air France v. Saks*, 470 U.S. 392, 399 (1985), where "the President and the Senate express a shared consensus on the meaning of a treaty as part of the ratification process, that meaning is to govern in the domestic context." *Auguste v. Ridge*, 395 F.3d 123, 143 (3d Cir. 2005). Here, there

is no doubt that the United States understood and expressly limited the scope of the CAT and ICCPR to pertain only to state or government action.

As such, the lack of a requirement that the conduct proscribed by 18 U.S.C. § 116(a) be committed by a person acting under the color of law is not simply a slight variance in language between the treaties and legislation. Instead, it constitutes a material departure from the United States' express understanding of the scope of the treaties in question, and no rational relationship can exist between the treaties and legislation. This is especially true given that the language limiting the scope of the treaties to acts committed by government officials was integral to ratification, as evidenced by the United States' reservation pertaining to Article 7 of the ICCPR. Accordingly, 18 U.S.C. § 116(a) cannot be said to have been passed to effectuate the CAT or ICCPR because Section 116(a) criminalizes conduct not contemplated by the treaties.

Article 24 of the ICCPR also calls on State Parties to recognize that:

> Every child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.

Again, however, specific understandings of the United States that are expressed in connection with the ratification of the ICCPR prohibit the enactment of Section 116(a) as a means to implement Article 24. Specifically, the ICCPR was ratified with the following understanding:

> The United States understands that this Convention shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the State and local governments; to the extent that State and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the State or local governments may take appropriate measures for the fulfillment of the Convention. [S. Exec. Rep. No. 102-23, at 18 (1992).]

The Senate Committee on Foreign Relations explained that it was necessary to include such language in order "to emphasize domestically that there is no intent to alter the constitutional balance of authority between the State and Federal governments or to use the provisions of the Covenant to 'federalize' matters now within the competence of the States. S. Exec. Rep. No. 102-23, at 18 (1992).

As previously indicated, "[t]he legal effect of ratification turns on the nature of the treaty itself and any reservations the Senate made." *United States v. Reed*, No. CR 15-188 (APM), 2017 WL 3208458, at *14 (D.D.C. July 27, 2017). The court in *Reed* held that 18 U.S.C. § 2423(c) could not have been enacted to implement the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography via the Treaty Power because the conduct that Section 2423(c) prohibits is not plainly adapted to implementing the stated goals of the Optional Protocol. *Id.* at *17. Consequently, it "violate[s] the structure and spirit of the Constitution for Congress to pass implementing legislation that causes the treaty to take on a shape that contradicts the Constitution, either by causing the treaty to reach a topic on which the President himself could not have negotiated or by allowing Congress to reserve for itself power to expand the treaty's scope beyond what the President negotiated on the country's behalf." *Id.*

Treating Section 116(a) as implementing legislation of Article 24 would permit Congress to regulate conduct the treaty neither demands nor authorizes and which Congress lacks independent power to

regulate. This is especially true where Congress explicitly limited the plain language of the treaty so that the treaty would not be interpreted to "federalize" matters within the competence of the states. S. Exec. Rep. No. 102-23, at 18 (1992). Accordingly, counts 1 through 5 of the Second Superseding Indictment should be dismissed because no treaty provides Congress the authority to enact the statute.

### F.   18 U.S.C. § 116(a) is an unconstitutional exercise of Congress' power under Article 1, Section 8 of the United States Constitution.

Congress' powers are enumerated in the eighteen clauses of Article I, Section 8 of the Constitution. See U.S. Const. art. I, § 8. Of the eighteen clauses, only the Commerce Clause is relevant to this case. See U.S. Const., art. I, § 8, cl. 3. The Commerce Clause delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3. As the Supreme Court has explained, its "interpretation of the Commerce Clause has changed as our Nation has developed." *Morrison*, 529 U.S. at 607. Though seldom used in the nineteenth century, the Commerce Clause became the chief engine for federal regulatory and criminal statutes in the latter two-thirds of the

twentieth century and "greatly expanded the previously defined authority of Congress under that Clause." *Lopez*, 514 U.S. at 552-556.

Yet, "even th[ose] modern-era precedents [that] expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits." *Id.* at 556-557. Indeed, in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937), while upholding the National Labor Relations Act, the Supreme Court emphasized that the Commerce Clause "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." This alarming and dangerous prospect, along with the need to identify enforceable limits on the Commerce Clause, was a motivating force behind the more recent Supreme Court decisions of *Lopez* and *Morrison*, which recognize that without any judicially enforceable limits, the Commerce Clause would too easily become an unconstitutional general police power denied to Congress by the Constitution.

In *Lopez*, the Supreme Court considered the constitutionality of former 18 U.S.C. § 922(q), the Gun-Free School Zones Act of 1990, which forbade "'any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.'" *Lopez*, 514 U.S. at 549 (quoting former 18 U.S.C. § 922(q)(1)(A)). Specifically, the Court considered whether this act was a permissible use of Congress' commerce power. In answering that question, the Court "heeded [the] warning" pronounced in *Jones & Laughlin Steel* and undertook to "decide whether a rational basis existed for concluding that [the] regulated activity sufficiently affected interstate commerce." *Id.* at 557.

In making this determination, the Court noted that it had not "'declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.'" *Id.* at 558 (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27 (1968)). "Rather, '[t]he Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is

of no consequence.'" *Id.* (quoting *Wirtz*, 392 U.S. at 197 n. 27) (emphasis omitted).

Pursuant to *Lopez*, Congress may regulate three broad categories of activity pursuant to its commerce power. *Id.* First, Congress may regulate the use of the channels of interstate commerce. *Id.* Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. *Id.* Third, Congress may regulate those activities that have a substantial relation to interstate commerce. *Id.* at 558-559. The Court further concluded that to qualify for the third category of activities that may be regulated, the regulated activity must "substantially affect" interstate commerce. *Id.* at 559.

### i. A review of *Lopez* and *Morrison* and the substantial effect on interstate commerce analysis

As in *Lopez*, 514 U.S. at 559, the first two categories of activities Congress can regulate pursuant to the Commerce Clause can be easily eliminated in the case at hand. 18 U.S.C. § 116(a) is not "a regulation of the use of channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the

channels of commerce." Thus, like the statute considered in *Lopez*, if Section 116(a) "is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce." *Lopez*, 514 U.S. at 559. As such, only the third category of activities that may be regulated will be discussed.

In *Lopez*, the effects-analysis can be broken down into four parts. First, the Court noted the relevance of the nature of the regulated activity and distinguished the Gun-Free School Zones Act from cases concerning the regulation of an intrastate activity that was economic in nature. *Id.* Second, the Court considered whether the contested statute had any jurisdictional element to ensure in individual cases that the prohibited firearm possession would affect interstate commerce. *Id.* at 562. Third, the Court considered the importance of the legislative history. *Id.* Lastly, the Court considered the practical implications of accepting the government's argument that the economic impact of the regulated activity had sufficient effects on interstate commerce to sustain the regulation. *Id.* at 564.

When analyzing the nature of the regulated activity in *Lopez*, the Court noted that *Wickard v. Filburn*, 317 U.S. 111 (1942), was perhaps

the most far-reaching example of Commerce Clause authority over intrastate activity. *Lopez*, 514 U.S. at 560. The *Lopez* Court, however, was quick to distinguish *Wickard* due to the fact *Wickard* involved economic activity in a way that the possession of a gun in a school did not. *Id.*

In *Wickard*, Roscoe Filburn operated a small farm in Ohio, where he would sell a modest amount of wheat, after using the majority for personal purposes. *Wickard*, 317 U.S. at 114. The Secretary of Agriculture assessed a penalty against Filburn under the Agricultural Adjustment Act of 1938 because Filburn harvested approximately 12 more acres of wheat than the Act permitted. *Id.* at 114-115. The Court in *Wickard* sustained the application of the Act to this activity, stating that home-grown wheat "competes with wheat in commerce," because "it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market." *Id.* at 128.

The *Lopez* Court differentiated the Gun-Free School Zones Act from the statute in *Wickard*, because:

> Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation

of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce. [*Lopez*, 514 U.S. at 561 (footnote omitted).]

The Court distinguished the Commerce Clause analysis between situations where the regulated intrastate activity is economic in nature and situations where the intrastate activity is not.

Next, the *Lopez* Court considered it important that the statute in question did not contain a "jurisdictional element which would ensure, through case-by case inquiry, that the firearm possession in question affects interstate commerce." *Id.* By way of comparison, the Court in *Lopez* contrasted the case of *United States v. Bass*, 404 U.S. 336, 337 (1971), in which the Court interpreted the former 18 U.S.C. § 1202(a), which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce . . . any firearm[.]" The *Bass* Court interpreted the possession component of Section 1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state

balance." *Id.* at 348-349. The *Bass* Court set aside the contested conviction because, although the government had demonstrated that the defendant had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." *Id.* at 347. Unlike the statute in *Bass*, however, the *Lopez* Court noted that Section 922(q) had "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562.

With regard to the import of the Gun-Free School Zone Act's legislative history, the Court in *Lopez* noted that no express congressional findings had been made or presented concerning the effects gun possession in a school zone might have upon interstate commerce. *Id.* The Court explained that although such findings were not absolutely necessary, "to the extent that congressional findings would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Id.* at 563. (footnote omitted).

Finally, the Court considered the government's argument that possession of a firearm in a school zone may result in violent crime, which could affect interstate commerce in two ways. *Id.* at 563-564. First, the government claimed that "the costs of violent crime are substantial" and that "through the mechanism of insurance, those costs are spread throughout the population." *Id.* Second, the government argued that "the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment[,]" which would result in a "less productive citizenry[,]" which would "have an adverse effect on the Nation's economic well-being." *Id.* at 564.

The Court, however, observed that if the regulation was constitutional based on these claims, then Congress' power would be limitless. *Id.* The Court first explained that under the government's "costs of crime" reasoning, Congress would be able to regulate "not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they related to interstate commerce." *Id.* Next, the Court similarly cautioned that under the government's "national productivity" reasoning, Congress could regulate "any activity that [Congress] found was related to the economic productivity of

individual citizens: family law (including marriage, divorce, and child custody), for example." *Id.* The Court concluded, "Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.*

Consequently, the Court held Section 922(q) of the Gun-Free School Zones Act unconstitutional and reaffirmed the long-held principle that "[w]ere the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *Id.* at 577 (Kennedy, J., concurring).

Five years later, relying on *Lopez*, the Supreme Court again invalidated a statute it determined Congress lacked authority to enact pursuant to its commerce power in *Morrison*. *Morrison* concerned a Virginia Tech student who claimed two members of the school's football team "assaulted and repeatedly raped her." *Morrison*, 529 U.S. at 601. The female student filed a complaint alleging that the football players'

conduct violated the Violence Against Women Act (VAWA), which is codified within 42 U.S.C. § 13981. *Morrison*, 529 U.S. at 604. Specifically, Section 13981(b) of the Act states that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). To enforce that right, subsection (c) declares:

> A person (including a person who acts under the color of any statute, ordinance, regulation, custom or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

The defendants then moved to dismiss the complaint on the grounds that Section 13981's civil remedy provision was unconstitutional. *Morrison*, 529 U.S. at 604.

The *Morrison* Court, in applying the four factors outlined in *Lopez*, first considered whether the civil remedy provision of the VAWA regulated intrastate or economic activity. *Morrison*, 529 U.S. at 609-613. Like the Court in *Lopez*, the Court determined that gender-motivated crimes were "not, in any sense of the phrase, economic activity." *Id.* at 613. Likewise, the Court noted that Section 13981, like

the Gun-Free School Zones Act, contained "no jurisdictional element establishing that the federal cause of action [was] in pursuance of Congress' power to regulate interstate commerce." *Id.* It explained, "Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime." *Id.* (footnote omitted).

One difference, however, between the statute in question in *Lopez* and the statute in question in *Morrison* was that Section 13981 was "supported by numerous findings regarding the serious impact that gender-motivated violence [had] on victims and their families." *Id.* at 614. [4] Nevertheless, the *Morrison* Court found persuasive *Lopez's* proclamation that "'simply because Congress may conclude that a particular activity substantially affects interstate commerce does not

---

[4] Congress found that gender-motivated violence would affect interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." *Morrison*, 529 U.S. at 615 (quoting H.R. Conf. Rep. No. 103-711, at 385, U.S. Code Cong. & Admin. News 1994, pp. 1803, 1853).

necessarily make it so.'" *Id.* (quoting *Lopez*, 514 U.S. at 557, n.2, (additional citations omitted)).

With that in mind, the *Morrison* Court determined Congress' findings concerning the interstate effects of gender-motivated crime to be unpersuasive because they heavily relied on a method of reasoning already rejected by the Supreme Court as "unworkable" if the Court was "to maintain the Constitution's enumeration of powers." *Id.* at 615. The Court explained that "[t]he reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce[,]" and warned that "if Congress may regulate gender-motived violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part." *Id.* The Court further cautioned that if it were to accept petitioner's claim Congress would not solely be limited to regulating violence, but also "family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and

childrearing on the national economy is undoubtedly significant." *Id.* at 615-616.

As such, the *Morrison* Court likewise rejected the argument that Congress may regulate noneconomic criminal conduct based on the assertion that the conduct in the aggregate would affect interstate commerce. *Id.* at 617. In doing so, the Court explicitly rejected the invitation to distinguish between what is truly national and what is truly local, relying on the principle that "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id.* at 617-618.

Consequently, the civil remedy provision in question in *Morrison* was held unconstitutional, and the Supreme Court once again reiterated that the Supreme Court has "'*always* . . . rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power[.]'" *Id.* at 618-619 (quoting *Lopez*, 514 U.S. at 584 (Thomas, J., concurring)).

i.   **There is no rationale under the Commerce Clause that provides Congress with the authority to enact 18 U.S.C. § 116(a).**

18 U.S.C. § 116(a), like the statutes in question in *Morrison* and *Lopez*, also lacks criteria indicating it was enacted to regulate an activity having a substantial relationship to interstate commerce. Notably, FGM is not an economic or commercial activity. Instead, like the statute considered in *Lopez*, Section 116(a) "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 561. As the Supreme Court made clear in *Morrison*, "the noneconomic, criminal nature of conduct at issue [in *Lopez*] was central to [the Supreme Court's] decision in that case." *Morrison*, 529 U.S. at 610.

Additionally, Section 116(a) is "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. There is also no similarity to the statute in *Gonzales v. Raich*, 545 U.S. 1, 32-33 (2005), in which the Court upheld the authority of Congress to prohibit the domestic consumption of marijuana, a home-

grown commodity, where that prohibition was an indirect and supplemental, but essential, means of enforcing regulations on the national market in that commodity. Likewise, there are no congressional findings to support the statute in comparison to child pornography, which has become a "'highly organized, multimillion dollar industry that operates on a nationwide scale[.]'" *United States v. Brown*, 327 Fed. Appx. 526, 531 (6th Cir. 2006) (citing S. Rep. No. 95-438, at 5 (1977)).

Here, there is nothing in Section 116(a)'s legislative history indicating that Congress, in enacting the statute, was attempting to regulate the prohibited activity because a national market existed for the proscribed conduct. Instead, the legislative history reveals that the driving force behind Senator Reid's legislation was his belief that the prohibited conduct was "repulsive and cruel." September 20, 1995 Record. The Senator's belief, however, cannot be substituted for what the Constitution demands – that the regulated activity must "arise out of or [be] connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez*, 514 U.S. at 561.

48

Further, 18 U.S.C. § 116(a) contains no jurisdictional element, which "would ensure, through case-by-case inquiry, that the [statute] affects interstate commerce." *Id.* Nor does Section 116(a) require any type of jurisdictional nexus to interstate activity or movement be established for conviction. See *Bass*, 404 U.S. at 349. Instead, like the statutes in *Morrison* and *Lopez,* Section 116(a), on its face, seeks to punish intrastate crime with no nexus to commerce. Notably, Section 116(a) was enacted after the Supreme Court rendered its decision in *Lopez*, which made clear that a jurisdictional element ensures that a statute have "the requisite nexus with interstate commerce." *Lopez*, 514 U.S. at 549. Nevertheless, the legislature here, like the legislature that enacted the statute in *Morrison*, fatally chose to cast Section 116(a) "over a wider, and more purely intrastate, body of violent crime." *Morrison*, 529 U.S. at 613. Where Congress is not regulating economic activity, however, insisting on jurisdictional language in a federal criminal statute is essential because, "[u]nder our federal system, the 'States possess primary authority for defining and enforcing the criminal law.'" *Lopez*, 514 U.S. at 561 n. 3 (internal citations and quotation marks omitted).

Moreover, in enacting Section 116(a), Congress made no findings regarding any effect FGM might have on interstate commerce. While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," *Lopez*, 514 U.S. at 562, the existence of such findings "enable [courts] to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye[.]" *Id.* at 563. Here, the congressional record is completely void of any reference to any economic effect the regulated activity might have and, in fact, points to the contrary – the statute was enacted because of the perception that the conduct was "repulsive and cruel."

Instead, to justify the federal criminal statute, Congress stated within its findings that "the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control[.]" Pub. L. 104-208, div. C, title VI, § 645(a)(4), Sept. 30, 1996, 110 Stat. 3009-708. This finding, however, is not supported by the legislative record, and in fact, was directly contradicted by Congresswoman Schroeder when applauding

states for enacting legislation prohibiting FGM. See Cong. Rec., 104th Cong., 1st Sess., Vol. 141, No. 163 at E 1988 (Oct. 20, 1995) (Exh. U).

Representative Schroeder stated, "I have spoken on this floor many times regarding FGM, and some States are now passing or considering their own legislation to ban it." *Id.* She also said that, at the time, Minnesota, New Jersey, New York, and North Dakota had introduced or passed legislation banning FGM, and she further stated, "I'm happy to report that Colorado has joined the growing ranks of States that are drawing up their own legislation to ban female genital mutilation." Cong. Rec., 104th Cong., 2d Sess., Vol. 142, No. 9 at E70 (Jan. 24, 1996) (Exh. V). These statements counter any argument that the statute is grounded in the powers enumerated by the Commerce Clause.

"When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" *Lopez*, 514 U.S. at 561 n. 3 (internal citations and quotation marks omitted). More significant, however, is the principle that the federal government cannot usurp the province of the States simply because it decides it would be convenient.

Importantly, Congress' finding here has nothing to do with any purported impact on interstate commerce. As the *Lopez* Court made clear, where the legislative history is silent, a substantial interstate commerce nexus must be "visible to the naked eye" without resorting to "pil[ing] inference upon inference" until nothing is left of state autonomy. *Id.* at 563, 567.

By way of comparison, in enacting the Freedom of Access to Clinic Entrances Act (the "Access Act"), 18 U.S.C. § 248, the Senate similarly found that the prohibited conduct, the physical obstruction of facilities providing reproductive health services, was "beyond the scope of local and state authorities." *Norton v. Ashcroft*, 298 F.3d 547, 559 (6th Cir. 2002) (citing H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706). Additionally, however, the legislative record of the Access Act also indicated that there was a "national market for abortion services[,]" and "Congress concluded that the clinic blockades and violent protests proscribed by the Act forced clinics to close, caused harmful delays in the provision of medical services, increased health risks to patients, S. Rep. No. 103-117, at 14-15, and caused millions of dollars of damage to reproductive health facilities, H.R. Rep. No. 103-306, at 7." *Id.* at 558.

As such, the Access Act has been upheld as a valid exercise of Congress' commerce power.

Nevertheless, with regard to Congress' finding that the obstruction of healthcare facilities was a nationwide problem beyond the control of the individual states, the United States Court of Appeals for the Seventh Circuit explained:

> We agree with the district court that this finding, standing alone, does not justify Congress's power to enact the Access Act. As the district court noted, it is not enough that a problem is national in scope or that local officials are unable to control the problem. Rather, the activities must substantially affect interstate commerce. Thus Congress's finding that the problems of reproductive health facilities are national in scope adds little to the relevant inquiry. [*United States v. Wilson*, 73 F.3d 675, 683 (7th Cir. 1995) (internal citation omitted).]

In holding the Access Act constitutional, the Sixth Circuit likewise did not rest its holding on the fact that the Senate found the proscribed conduct beyond the control of local authorities, but instead reasoned that "the Act, unlike the Violence Against Women Act's civil remedy provision, regulate[d] activity . . . that has a direct economic effect" and explained that while the statute did not contain an express jurisdictional hook, "[g]iven the detailed congressional record, [it was] satisfied that Congress had a rational basis to conclude that the

activities prohibited by the Act disrupted the national market for abortion-related services and decreased the availability of such services." *Norton*, 298 F.3d at 556, 558.

Here, Congress' determination that the unique circumstances of FGM place it beyond the ability of any single state or local jurisdiction to control is not coupled with findings indicating that the proscribed conduct impacts interstate commerce nor is there a single House or Senate Report indicating this. The criminal statute was never debated, and Congress did not hear testimony concerning the law or the basis upon which it could be enacted.

Lastly, in *Morrison*, 529 U.S. at 617, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." In doing so, the Court was recognizing the principle that "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id*.

Notably, here, the activity being regulated has absolutely no effect on interstate commerce, and any connection to interstate commerce that

might be imagined would be sufficient to render virtually any conduct within federal control. As the Supreme Court has cautioned, although Congress clearly has power to regulate interstate commerce, and that legislation can extend to the regulation of purely intrastate activity, the scope of the latter power is limited and "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them . . . would effectually obliterate the distinction between what is national and what is local[.]" *Jones & Laughlin Steel Corp.*, 301 U.S. at 37. Rather, something more than a "relatively trivial impact on commerce" is necessary. *Lopez*, 514 U.S. at 559. Here, there is simply no link between the activity being regulated and interstate commerce, and the statute must fail.

## Conclusion

Dr. Nagarwala, Dr. Attar, and Mrs. Attar respectfully request that this Court dismiss counts 1, 2, 3, 4, and 5 because Congress lacked authority to enact 18 U.S.C. § 116(a).

Respectfully submitted,

Dated: 7/27/2018                    /s/ Shannon M. Smith
                                    SHANNON M. SMITH
                                    Attorney for Jumana Nagarwala

Dated: <u>7/27/2018</u>    <u>/s/ Molly Blythe</u>
          MOLLY BLYTHE
          Attorney for Jumana Nagarwala


Dated: <u>7/27/2018</u>    <u>/s/ Mary Chartier</u>
          MARY CHARTIER
          Attorney for Fakhruddin Attar

Dated: <u>7/27/2018</u>    <u>/s/ Matthew Newburg</u>
          MATTHEW NEWBURG
          Attorney for Farida Attar

<u>Certificate of Service</u>

I hereby certify that on July 27, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification to parties enrolled through the ECF system. A hard copy has been mailed via the United States Postal Service to those who are not enrolled.

<u>/s/ Shannon M. Smith</u>
SHANNON M. SMITH
Attorney for Defendant Jumana Nagarwala
The Law Offices of Shannon M. Smith, P.C.
1668 South Telegraph Road
Suite 140
Bloomfield Hills, Michigan 48302
(248) 636-2595
attorneyshannon@gmail.com