Case 2:17-cr-20274-BAF-DRG   ECF No. 30-74   PageID.2233   Filed 07/29/18   Page 1 of 27

# INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

MARCH 24 (legislative day, JANUARY 30), 1992.—Ordered to be printed

Mr. PELL, from the Committee on Foreign Relations,
submitted the following

# REPORT

[To accompany Executive E, 95–2]

The Committee on Foreign Relations to which was referred the International Covenant on Civil and Political Rights, adopted unanimously by the United Nations General Assembly on December 16, 1966, and signed on behalf of the United States on October 5, 1977, having considered the same, reports favorably thereon with 5 reservations, 5 understandings, 4 declarations, and 1 proviso, and recommends that the Senate give its advice and consent to ratification thereof.

## CONTENTS

| | Page |
|---|---|
| I. Purpose | 1 |
| II. Background | 2 |
| III. Committee Action | 2 |
| IV. Committee Comments | 3 |
| V. Major Provisions | 5 |
| VI. Bush Administration Conditions | 6 |
| VII. Explanation of Bush Administration Conditions | 10 |
| VIII. Cost Estimate | 21 |
| IX. Text of the Resolution of Ratification | 21 |
| X. Appendix A: President Bush's Letter to Chairman Pell | 25 |
| XI. Appendix B: Administration Responses to Questions from Senator Moynihan on Article 22 | 26 |

## I. PURPOSE

The Covenant guarantees a broad spectrum of civil and political rights, rooted in basic democratic values and freedoms, to all individuals within the territory or under the jurisdiction of the States Party without distinction of any kind, such as race, gender, ethnicity, et cetera. The Covenant obligates each State Party to respect

59–119

and ensure these rights, to adopt legislative or other necessary measures to give effect to these rights, and to provide an effective remedy to those whose rights are violated.

The Covenant also establishes a Human Rights Committee to oversee compliance and investigate reports of noncompliance made by one Party against another.

## II. BACKGROUND

The International Covenant on Civil and Political Rights was adopted unanimously by the United Nations General Assembly on December 16, 1966, and entered into force on March 23, 1976. To date, 103 States have become Party to the Covenant and another 5 have signed.

The United States signed the Covenant on October 5, 1977. President Carter transmitted the Covenant to the Senate on February 23, 1978, with several proposed U.S. conditions. The Foreign Relations Committee held hearings on this, and three other human rights treaties submitted by the Carter Administration, on November 14, 15, 16, and 19, 1979. Domestic and international events at the end of 1979, including the Soviet invasion of Afghanistan and the hostage crisis in Iran, prevented the Committee from moving to a vote on the Covenant. The Reagan Administration did not indicate any interest in ratifying the Covenant.

On August 8, 1991, President Bush sent a letter to Senator Claiborne Pell, the chairman of the Foreign Relations Committee, urging the Senate to renew its consideration of the Covenant "with a view to providing advice and Consent to ratification." On November 21, 1991, the Bush Administration submitted a package of proposed U.S. conditions which are, in many respects, similar to those proposed by the Carter Administration.

The Covenant is part of the international community's early efforts to give the full force of international law to the principles of human rights embodied in the Universal Declaration of Human Rights and the United Nations Charter. The Civil and Political Rights Covenant is rooted in western legal and ethical values. The rights guaranteed by the Covenant are similar to those guaranteed by the U.S. Constitution and the Bill of Rights.

## III. COMMITTEE ACTION

On November 21, 1991, the Committee on Foreign Relations held a public hearing on the International Covenant on Civil and Political Rights. Richard Schifter, Assistant Secretary of State for Human Rights and Humanitarian Affairs, testified on behalf of the Administration. The following public witnesses also testified: Professor Louis B. Sohn, Chair Elect, Section of International Law and Practice, American Bar Association; Professor Ronald Rotunda, College of Law, University of Illinois; Dr. Carole Nagengast, Chair, Board of Directors, Amnesty International; Harold W. Andersen, Chairman, World Press Freedom Committee; William T. Lake, Member, Board of Directors, International Human Rights Law Group; Michael H. Posner, Executive Director, Lawyers Committee for Human Rights; and Bruce Fein, attorney and columnist.

The Committee met to consider the Covenant on March 4, 1992. The Committee adopted by voice vote an amendment offered by Senator Helms to the proposed resolution of ratification. The Helms amendment added a proviso, to be included in the resolution of ratification but not in the instrument of ratification, clarifying the relationship of the Covenant to the U.S. Constitution. The Committee then voted 19 to 0 to report favorably the Covenant with a resolution of ratification to the Senate for its advice and consent. Ayes: Senators Pell, Biden, Sarbanes, Cranston, Dodd, Kerry, Simon, Sanford, Moynihan, Robb, Wofford, Helms, Lugar, Kassebaum, Pressler, Murkowski, McConnell, Brown, and Jeffords.

The resolution of ratification reported by the Committee contains the reservations, understandings, and declarations submitted by the Bush Administration and the Helms proviso.

## IV. COMMITTEE COMMENTS

The International Covenant on Civil and Political Rights is one of the fundamental instruments created by the international community for the global promotion and protection of human rights. Over 100 States, including the member states of the European Community, Canada, and other traditional U.S. allies, have ratified the Covenant. In view of the leading role that the United States plays in the international struggle for human rights, the absence of U.S. ratification of the Covenant is conspicuous and, in the view of many, hypocritical. The Committee believes that ratification will remove doubts about the seriousness of the U.S. commitment to human rights and strengthen the impact of U.S. efforts in the human rights field.

The rights enumerated in the Covenant, such as freedom of thought, conscience, religion, and expression, the right to vote, and the right to a fair trial, are the cornerstones of a democratic society. The historical changes in the Soviet Union and Eastern Europe have created an opportunity for democracy to grow and take hold. By ratifying the Covenant at this time, the United States can enhance its ability to promote democratic values and the rule of law, not only in Eastern Europe and the successor states of the Soviet Union but also in those countries in Africa and Asia which are beginning to move toward democratization.

Ratification will enable the United States to participate in the work of the Human Rights Committee established by the Covenant to monitor compliance. Since its creation in 1977, the Human Rights Committee has established an impressive record and has become an important element in the U.N. human rights system. The Committee agrees with the Administration that the United States should accept the competence of the Human Rights Committee to hear complaints from one State Party about another State Party's failure to comply. This competence is critical to the Human Rights Committee's ability to monitor and enforce compliance. By accepting this competence, the United States will not only further enhance the effectiveness of the Human Rights Committee but also have an opportunity to play a more aggressive role in the process of enforcing compliance with the Covenant.

4

Strong support for ratification was expressed by the majority of witnesses that testified at the Committee's hearing in November. The principal argument against ratification was rooted in concern about certain limitations that the Covenant allows on freedom of speech and freedom of expression. Article 19 of the Covenant guarantees the right to freedom of expression in all its forms. However, this right can be restricted under Article 19 in certain circumstances, for example to protect national security or public order. Article 20 of the Covenant prohibits propaganda for war and advocacy of national, racial or religious hatred that would result in discrimination, hostility, or violence.

The Committee recognizes that these restrictions are inconsistent with the guarantees of free speech in the U.S. Constitution and the Bill of Rights and, therefore, strongly supports the Administration's proposed reservation to Article 20 and declaration on the limitation of rights. The Committee believes that these adequately address any potential problem which might arise with respect to this area. The Administration's proposed conditions, which are incorporated in the Committee's resolution of ratification, make it absolutely clear that no restrictions will be imposed on the rights of free speech and expression in the United States. Ratification of the Covenant will allow the United States to seek revisions in Articles 19 and 20 and to help ensure that the limitations permitted under these articles are interpreted narrowly.

The overwhelming majority of the provisions in the Covenant are compatible with existing U.S. domestic law. In those few areas where the two diverge, the Administration has proposed a reservation or other form of condition to clarify the nature of the obligation being undertaken by the United States. This approach has caused concern among some private groups and individuals in the human rights field who argue that U.S. law should be brought into conformance with international human rights standards in those areas where the international standards are superior.

The Committee recognizes the importance of adhering to internationally recognized standards of human rights. Although the U.S. record of adherence has been good, there are some areas in which U.S. law differs from the international standard. For example, the Covenant prohibits the imposition of the death penalty for crimes committed by persons below the age of eighteen but U.S. law allows it for juveniles between the ages of 16 and 18. In areas such as these, it may be appropriate and necessary to question whether changes in U.S. law should be made to bring the United States into full compliance at the international level. However, the Committee anticipates that changes in U.S. law in these areas will occur through the normal legislative process.

The approach taken by the Administration and the Committee in its resolution of ratification will enable the United States to ratify the Covenant promptly and to participate with greater effectiveness in the process of shaping international norms and behavior in the area of human rights. It does not preclude the United States from modifying its obligations under the Covenant in the future if changes in U.S. law allow the United States to come into full compliance. In view of this situation, ratification with the Administration's proposed reservations, understandings, and declarations is

supported by a broad coalition of human rights and legal groups and scholars in the United States, notwithstanding concerns any of them may have with respect to particular conditions.

Subsequent to the Committee's hearing, questions were raised as to whether ratification would require any changes in United States labor law. The Administration has taken the position that ratification would have no effect on the domestic labor law of the United States. The Administration has concluded that the rights of association embodied in Article 22 of the Covenant are general rights of association similar to those contained in the First Amendment and that nothing in the Covenant would require the United States to alter or amend any labor legislation. The Committee accepts this conclusion and agrees with the Administration's views, as stated in Appendix B.

During consideration of the Covenant on March 4, the Committee accepted a proviso, offered by Senator Helms, to be included in the resolution of ratification but not in the instrument of ratification. The proviso states that the Covenant does not require any legislation or other action prohibited by the Constitution. It is similar to language adopted by the Senate in October 1990 during consideration of the resolution of ratification of the Covenant Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The substantive language of the proviso reflects the Administration's position on the relationship between treaties and the Constitution Since this relationship is a matter of domestic U.S. law, the proviso is not included in the instrument of ratification. This approach eliminates the potential for confusion at the international level about the nature of the U.S. ratification.

## V. Major Provisions

### 1. Rights guaranteed

Each Party to the Covenant undertakes "to respect and to ensure" to all individuals within its territory and under its jurisdiction the rights recognized in the Covenant "without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status"; to adopt legislative or other measures necessary to give effect to these rights; and to provide an effective remedy to those whose rights are violated.

The rights enumerated in the Covenant include: self-determination; right to life; right to liberty and security of person; right to compensation for unlawful arrest or detention; liberty of movement; right to a fair trial; right of privacy; freedom of thought, conscience, and religion; freedom of expression; right of peaceful assembly; freedom of association; rights of the family; right to vote and participate in public affairs; and equal protection of the law.

### 2. Prohibitions

The Covenant prohibits torture or cruel, inhuman or degrading treatment or punishment; slavery, servitude, and other forms of forced or compulsory labor; propaganda for war, and advocacy of national, racial or religious hatred.

*3. Public emergencies*

Parties to the Covenant may, in time of declared public emergency, take measures derogating from their obligations as required by the situation as long as such measures are not inconsistent with international law and do not involve racial, ethnic, religious, social, or sex discrimination.

*4. Human Rights Committee*

The Covenant establishes a Human Rights Committee, composed of eighteen members with recognized competence in the human rights field, to oversee compliance with the provisions of the Covenant by the Parties. Members are nationals of and nominated by the Parties and serve for four-year terms. The Committee receives reports from the Parties on the measures they have adopted to give effect to he rights enumerated in the Covenant and "on the progress made in the enjoyment of those rights."

At any time a Party may declare that it recognizes the Committee's competence to "receive and consider communications" (i.e. complaints) from one Party that another Party has failed to fulfill its obligations under the Covenant. The Committee can exercise this authority only if both Parties—the complaining State and the State which is the object of the complaint—recognize the Committee's competence. The Committee has one year to investigate and report on the complaint. It also has the authority to set up an ad hoc Conciliation Commission, with the prior consent of the Parties involved, to assist in resolving the matter if the Committee itself fails to do so to the Parties' satisfaction.

*5. Obligations of Federal States*

The Covenant states expressly that obligations undertaken by the Parties extend to all parts of federal states "without any limitations or exceptions."

## VI. Bush Administration Conditions

The Carter Administration transmitted the Covenant to the Senate in February 1978 with 8 conditions (4 reservations, 1 understanding, 2 declarations, and 1 statement). In many respects, the conditions proposed by the Bush Administration are similar to those proposed by the Carter Administration. Following is a summary of the reservations, understandings, and declarations proposed by the Bush Administration and incorporated in the Committee's resolution of ratification.

### RESERVATIONS

*1. Free speech*

Article 20 of the Covenant prohibits propaganda for war and advocacy of national, racial, or religious hatred that constitutes incitement to discrimination, hostility or violence. Because the prohibitions of Article 20 would contravene the First Amendment to the Constitution, the Administration proposed a reservation to the effect that Article 20 does not authorize or require the restriction

of free speech or freedom of association. The Carter Administration proposed a similar reservation.

### 2. Capital punishment

Article 6 limits the circumstances in which capital punishment may be imposed. Article 6 specifically prohibits the imposition of the death sentence for crimes committed by persons below 18 years of age and on pregnant women. The Administration accepted the obligation with respect to pregnant women. However, it proposed a reservation clarifying that the United States does not accept the prohibition on executing people for crimes committed while they were 16 or 17 years of age. The execution of people for crimes committed while they were under the age of 16 has been ruled unconstitutional by the Supreme Court. The reservation proposed by the Bush Administration is significantly narrower than that proposed by the Carter Administration.

### 3. Cruel, inhuman or degrading treatment or punishment

Article 7 prohibits the use of cruel, inhuman or degrading treatment or punishment. The Administration proposed a reservation limiting its obligation to cruel, inhuman, unusual or inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution. This reservation is consonant with the reservation proposed by the Administration and adopted by the Senate in the resolution of ratification of the Covenant against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

### 4. Criminal penalties

Article 15, paragraph 1, stipulates that a person who has committed an offense shall benefit from any changes in law, made subsequent to the commission of the offense, that provide for a lighter penalty. Under U.S. law the offender generally gets the punishment in effect at the time of the offense. The Administration proposed a reservation to conform the United States' obligation under this paragraph to U.S. domestic law. The Carter Administration proposed a similar reservation.

### 5. Juveniles

Paragraphs 2(b) and 3 of Article 10 stipulate respectively that accused juveniles be separated from adults and that juvenile offenders be segregated from adults and be accorded treatment appropriate to their age and legal status. Paragraph 4 of Article 14 requires that in the case of juveniles, the trial procedure of the criminal justice system shall take into account their age and the desirability of promoting their rehabilitation.

Although current domestic practice is generally in compliance with these provisions, there are instances in which juveniles are not separated from adults, for example because of the juvenile's criminal history or the nature of the offense. In addition, the military justice system in the United States does not guarantee special treatment for those under age 18. For these reasons, the Administration proposed a reservation stating that the United States reserves the right, in "exceptional circumstances", to treat juveniles

as adults notwithstanding these provisions of the Covenant. The Administration's proposal also reserves with respect to individuals who volunteer for military service prior to age 18.

## UNDERSTANDING

### 1. Non-discrimination and equal protection

Article 2, paragraph 1 and Article 4, paragraph 1, guarantee the rights in the Covenant on a nondiscriminatory basis. Article 26 provides equal protection before the law and equal protection of the law without any discrimination. U.S. law makes some legal distinctions, for example on the basis of age. The Administration proposed an understanding to the effect that the United States does not regard these distinctions as inconsistent with its obligations under the Covenant.

### 2. Right to compensation for illegal arrest and miscarriage of justice

Article 9, paragraph 5, and Article 14, paragraph 6, establish an enforceable right to compensation for a person subjected to unlawful arrest or detention or to a miscarriage of justice. The Administration argues that U.S. law provides the right to seek compensation but does not provide a right to obtain compensation. Therefore, the Administration proposed an understanding conforming U.S. obligations under these paragraphs to domestic law. The Carter Administration proposed similar language in the form of a reservation.

### 3. Separate treatment of the accused

Article 10, paragraph 2, requires that accused persons be segregated "save in exceptional circumstances" from convicts and that juveniles who are accused of a crime be separated from adults. The Administration argues that federal law and prison policy conform to this approach for the most part. However, some exceptions exist. For example, prison authorities are allowed to take factors such as a prisoner's overall dangerousness into account when determining treatment. In addition, prisoners are allowed to waive segregation to participate in special programs. The Administration proposed an understanding clarifying the meaning of the term "exceptional circumstances" to include these cases.

Paragraph 3 of Article 10 states that the essential aim of the penal system is reformation and social rehabilitation. The Administration proposed an understanding clarifying the relationship between these goals and other traditional goals of the penal system such as punishment.

The Carter Administration proposed a statement declaring that the requirements of paragraphs 2 and 3 are goals to be achieved progressively.

### 4. Right to counsel, compelled witnesses, double jeopardy

Paragraphs 3(b) and 3(d) of Article 14 provide a defendant with the right to choose his own counsel. U.S. law recognizes circumstances, such as indigence, in which a defendant may not choose his own counsel. Therefore, the Administration proposed an under-

standing conforming the U.S. obligation under the treaty to domestic law.

Paragraph 3(e) of Article 14 entitles a defendant to obtain witnesses on his behalf under the same conditions as witnesses against him have been obtained. The Administration argues that U.S. law permits a defendant to obtain witnesses on his own behalf only to the extent necessary for his defense. Therefore, the Administration proposed an understanding conforming the U.S. obligation under this subparagraph to domestic law.

Paragraph 7 of Article 14 prohibits an individual from being tried or punished again for an offense for which he or she has already been finally convicted or acquitted. The Administration argues that the multiple jurisdictions in the United States allow an individual to be acquitted at one level and prosecuted again at the federal level or to be prosecuted in two different state jurisdictions. In recognition of this situation, the Administration proposed an understanding that would limit the application of the prohibition in paragraph 7 against double jeopardy.

These understandings are very similar to those proposed by the Carter Administration.

## 5. Federalism

Article 50 extends the provisions of the Covenant to all parts of federal states. Because of the federal nature of the U.S. system, the Administration proposed an understanding clarifying the degree to which the federal government is obliged to ensure compliance with the Covenant by state and local entities. The Administration proposed and the Senate approved a similar understanding in its resolution of ratification of the Convention against Torture. The Carter Administration proposed a federal-state reservation.

### DECLARATIONS

## 1. Non-self-executing

The Administration proposed a declaration stating that Articles 1 through 27 of the Covenant are not self-executing. These articles deal with the rights guaranteed and the activities prohibited by the Covenant.

## 2. Limitations on rights

Articles 19 and 20 allow certain limitations to be placed on the right of free speech. The Administration proposed a declaration stating that the United States will not limit this right and urging Parties to the Covenant to refrain from exercising the limitations on free speech permitted by the Covenant.

## 3. Competence of the Human Rights Committee

The Administration proposed a declaration stating that the United States accepts the competence of the Human Rights Committee under Article 41.

## 4. Natural wealth and resources

Article 47 states that nothing in the Covenant affects the right of all peoples to enjoy and utilize their natural wealth and resources.

The Administration proposed a declaration clarifying the relationship between this Article and international law.

## VII. Explanation of Bush Administration Conditions

The Bush Administration submitted its proposed reservations, understandings and declarations to the Committee on November 21, 1991. At the same time, the Administration submitted the following explanation of its proposals.

### INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

Explanation of Proposed Reservations, Understandings and Declarations

#### General Comments

In general, the substantive provisions of the Covenant are consistent with the letter and spirit of the United States Constitution and laws, both state and federal. Consequently, the United States can accept the majority of the Covenant's obligations and undertakings without qualification.

In a few instances, however, it is necessary to subject U.S. ratification to reservations, understandings or declarations in order to ensure that the United States can fulfill its obligations under the Covenant in a manner consistent with the United States Constitution, including instances where the Constitution affords greater rights and liberties to individuals than does the Covenant. Additionally, a few provisions of the Covenant articulate legal rules which differ from U.S. law and which, upon careful consideration, the Administration declines to accept in preference to existing law. Specific proposals dealing with both situations are included below.

To promote clarity of application and interpretation, it may be appropriate to address a few additional issues through comments to be included in the record of consideration by the Senate and its Foreign Relation Committee but which needs not be included in either the resolution of advice and consent or the instrument of ratification itself.

#### Formal Reservations

*1. Free speech (article 20)*

Although Article 19 of the Covenant specifically protects freedom of expression and opinion. Article 20 directly conflicts with the First Amendment by requiring the prohibition of certain forms of speech and expression which are protected under the First Amendment to the U.S. Constitution (i.e., propaganda for war and advocacy of national, racial or religious hatred that constitutes incitement to discrimination, religious hatred that constitutes incitement

to discrimination, hostility or violence). The United States cannot accept such an obligation.

Accordingly, the following reservation is recommended:

> Article 20 does not authorize or require legislation or other action by the United States that would restrict the right of free speech and association protected by the Constitution and laws of the United States.

This is a slight revision of the reservation proposed in 1978. It responds to criticisms of the earlier version by focusing specifically on Article 20 and omitting the reference to U.S. "practice." It seems appropriate to retain the reference to "laws," however, to make clear that we accept no obligation to limit statutory protections of free speech and association even where they are more protective than the Constitution requires. We do not believe a reference to Article 5(1) is required in this context.

### 2. Article 6 (capital punishment)

Article 6, paragraph 5 of the Covenant prohibits imposition of the death sentence for crimes committed by persons below 18 years of age and on pregnant women. In 1978, a broad reservation to this article was proposed in order to retain the right to impose capital punishment on any person duly convicted under existing or future laws permitting the imposition of capital punishment. The Administration is now prepared to accept the prohibition against execution of pregnant women. However, in light of the recent reaffirmation of U.S. policy towards capital punishment generally, and in particular the Supreme Court's decisions upholding state laws permitting the death penalty for crimes committed by juveniles aged 16 and 17, the prohibition against imposition of capital punishment for crimes committed by minors is not acceptable. Given the sharply differing view taken by many of our future treaty partners on the issue of the death penalty (including what constitutes "serious crimes" under Article 6(2)), it is advisable to state our position clearly.

Accordingly, we recommend the following reservation to Article 6:

> The United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

This reservation would, of course, leave open the possibility that Congress might adopt legislation, in connection with ratification of the Covenant or subsequently, prohibiting the imposition of the death penalty for crimes committed by those below 18. Legislation giving effect to the Cov-

enant's prohibition against executions of pregnant women will not be required, since neither the Federal nor the state governments in fact carry out executions until after the birth of the condemned woman's child.

### 3. Article 7 (torture/punishment)

Article 7 provides that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment or be subjected without his free consent to medical or scientific experimentation. Since the United States is already proceeding toward ratification of the more detailed Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment on the basis of several carefully crafted reservations, declarations and understandings, it will be made clear in the record that we interpret our obligations under Article 7 of the Covenant consistently with those we have undertaken in the Torture Convention.

We believe it is advisable to take, with respect to the Covenant, an identical reservation with regard to the meaning of "cruel, inhuman and degrading treatment or punishment." Because the Bill of Rights already contains substantively equivalent protections, and because the Human Rights Committee like the European Court of Human Rights) has adopted the view that prolonged judicial proceedings in cases involving capital punishment could in certain circumstances constitute such treatment, U.S. ratification of the Covenant should be conditioned upon a reservation limiting our undertakings in this respect to the prohibitions of the Fifth, Eighth and/or Fourteenth Amendments. This would also have the effect of excluding such other practices as corporal punishment and solitary confinement, both of which the Committee has indicated might, depending on the circumstances, be considered contrary to Article 7. (Most of the Committee's interpretive statements under Article 7 have focused on such practices as torture, disappearances, extrajudicial killings and incommunicado detention.)

To ensure uniformity of interpretation between the Covenant and the Torture Convention on this point, we recommend the following reservation:

> The United States considers itself bound by Article 7 to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.

No comparable reservation was proposed in 1978.

### 4. Article 15(1) (post-offense reductions in penalty)

Article 15, paragraph 1, precludes the imposition of a heavier penalty for a criminal offense than was applicable

at the time the offense was committed, and requires States Party to comply with any post-offense reductions in penalties: "[i]f, subsequent to the commission of the offense, provision is made by law for the imposition of the lighter penalty, the offender shall benefit thereby." Current federal law, as well as the law of most states, does not require such relief and in fact contains a contrary presumption that the penalty in force at the time the offense is committed will be imposed, although post-sentence reductions are permitted (see 18 U.S.C. § 3582(c)(2) and the Federal Sentencing Guidelines) and are often granted in practice when there have been subsequent statutory changes. Upon consideration, there is no disposition to require a change in U.S. law to conform to the Covenant.

Accordingly, we recommend a reservation similar to the one proposed in 1978:

> Because U.S. law generally applies to an offender the penalty in force at the time the offense was committed, the United States does not adhere to the third clause of paragraph 1 of Article 15.

### 5. Articles 10 (2)(b) and (3) (treatment of juveniles)

Several provisions of the Covenant contemplate the separate treatment of juveniles in the criminal justice system. Article 10, paragraph 2(b) provides that "[a]ccused juvenile persons shall be separated from adults. * * *" Similarly, Article 10, paragraph 3 provides that "[j]uvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status." Finally, Article 14, paragraph 4, concerning trial procedure in the criminal justice system, states that "[i]n the case of juveniles, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation."

Although current domestic practice generally is in compliance with these provisions, it is important that flexibility remain to address exceptional circumstances in which trial or incarceration of juveniles as adults is appropriate: for example, trial of certain juveniles as adults based on their criminal histories or the nature of their offenses, and incarceration of particularly dangerous juveniles as adults in order to protect other juveniles in custody. Moreover, special treatments cannot be guaranteed by the military justice system to those who volunteer for the services while under age 18.

Accordingly, we recommend the following reservation:

> The policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of Article 10 and paragraph 4 of Article 14. The

> United States further reserves to these provisions with respect to individuals who volunteer for military service prior to age 18.

No comparable reservation was proposed in 1978. The reference to "exceptional circumstances" is drawn from Article 10, paragraph 2(a), which permits the incarceration of accused adults with convicted adults under such conditions.

UNDERSTANDINGS

*1. Article 2(1), 4(1) and 26 (non-discrimination)*

The very broad anti-discrimination provisions contained in the above articles do not precisely comport with longstanding Supreme Court doctrine in the equal protection field. In particular, Articles 2(1) and 26 prohibit discrimination not only on the basis of "race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth" but also on any "other status." Current U.S. civil rights law is not so open-ended; discrimination is only prohibited for specific statuses, and there are exceptions which allow for discrimination. For example, under the Age Discrimination Act of 1975, age may be taken into account in certain circumstances. In addition, U.S. laws permits additional distinctions, for example between citizens and non-citizens and between different categories of non-citizens, especially in the context of the immigration laws.

In interpreting the relevant Covenant provisions, the Human Rights Committee has observed that not all differentiation of treatment constitutes discrimination, if the criteria for such differentiation are reasonable and objective and if the aim is to achieve a purpose which is legitimate under the Covenant. In its General Comment on non-discrimination, for example, the Committee noted that the enjoyment of rights and freedoms on an equal footing does not mean identical treatment in every instance.

Notwithstanding the very extensive protections already provided under U.S. law and the Committee's interpretive approach to the issue, we recommend the following understanding:

> The Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status—as those terms are used in Article 2, paragraph 1 and Article 26—to be permitted which such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in

paragraph 1 of Article 4 upon discrimination, in time of public emergency, based "solely" on the status of race, colour, sex, language, religion or social origin not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

*2. Articles 9(5) and 14(6) (compensation for unlawful arrest and miscarriage of justice)*

Article 9(5) provides that "anyone who has been victim of unlawful arrest or detention shall have an enforceable right to compensation." Article 14(6) requires "compensation according to law" for a person whose conviction has been reversed or who has been pardoned "on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice * * * unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him"). Some concern has been expressed that U.S. law does not, at either the federal or state level, in fact recognize an across-the-board, enforceable right of compensation in all circumstances involving unlawful arrest or detention or miscarriage of justice.

Clearly, federal law does provide an enforceable right to seek compensation against the individuals concerned (see, e.g., *Rivers* v. *Six Unknown Named Agents*, 403 U.S. 386 (1971)) and, in certain instances, against the government itself (for example, under the Federal Tort Claims Act). However, federal law does not generally accord a right to compensation for an arrest or detention made in good faith but ultimately determined to have been unlawful. See *Pierson* v. *Ray*, 386 U.S. 547 (1967); *Bivens*, supra; *Wood* v. *Strickland*, 420 U.S. 308 (1975). Moreover, the doctrine of sovereign immunity generally restricts opportunities for recovery of compensation against the government. For instance, military personnel may not sue the Federal Government for injuries incident to their military service, including alleged torts of this kind. Given the multiplicity of state and local jurisdictions in the United States, it is possible that in some other situations a victim of unlawful arrest or detention might not in fact be able to recover compensation, notwithstanding the variety of compensatory schemes which have been adopted.

Although we do not believe that Article 9(5) in fact reflects an international legal standard requiring payment of compensation in *all* circumstances, the negotiating history of the Covenant is at best ambiguous. With respect to Article 9(5), a U.S. proposal to replace the words "an enforceable right to compensation" with "a right of action for compensation" was twice rejected, as was a U.S. attempt to amend Article 14(6) to read "a miscarriage of justice through no misconduct or neglect of [the individual concerned]." Moreover, we are unaware of any authoritative interpretations limiting Article 9(5), for example, to arbi-

trary arrests and detentions or defining the content of "miscarriage of justice" in Article 14(6).

Accordingly, we recommend an understanding clarifying that we view these provisions as imposing an obligation to provide appropriate avenues to seek (rather than in every instance to obtain) compensation, subject to reasonable requirements of domestic law.

> The United States understands the right to compensation referred to in Articles 9(5) and 14(6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

### 3. Article 10 (2) and (3) (separate treatment of the accused)

Article 10 (2)(a) provides that, "save in exceptional circumstances," accused persons shall be "segregated" from the convicted and given "separate treatment appropriate to their status as unconvicted persons." Article 10(3) provides that the essential aim of treatment of prisoners in the penitentiary system shall be their reformation and social rehabilitation.

Federal law and prison policy generally accords with these requirements but permits prison authorities to take into account additional factors, such as the prisoner's overall dangerousness, in determining his treatment; prisoners may also waive segregation in order to participate in special programs. Additionally, punishment, deterrence and incapacitation are recognized as legitimate penal objectives. Moreover, segregation of the accused from the convicted, while consistent with DOD policy, cannot always be guaranteed in light of military exigencies.

A number of other States Parties have conditioned their acceptance of Article 10 on statements that these provisions must be interpreted flexibly and taken as objectives to be achieved progressively. A "statement" to that effect was proposed in 1978. There is a basis in the negotiating history for so interpreting paragraph 2(a) concerning segregation of the accused from the convicted; there is no reference to differential treatment of the accused by the military; and there is virtually no interpretive guidance of these provisions by the Human Rights Committee.

Accordingly, we believe it prudent to include the following understanding:

> The United States understands the reference to "exceptional circumstances" in paragraph 2(a) of Article 10 to permit the imprisonment of an accused person with convicted persons where appropriate in light of an individual's overall danger-

ousness, and to permit accused persons to waive their right to segregation from convicted persons. The United States further understands that paragraph 3 of Article 10 does not diminish the goals of punishment, deterrence, and incapacitation as additional legitimate purposes for a penitentiary system.

### 4. Article 14 (right to counsel, compelled witness, and double jeopardy)

In a few particular aspects, this Article could be read as going beyond existing U.S. domestic law. In particular, current Federal law does not entitle a defendant to counsel of his own choice when he is either indigent or financially able to retain counsel in some form; nor does federal law recognize a right to counsel with respect to offenses for which imprisonment is not imposed. With respect to the compelled attendance and examination of witnesses, a criminal defendant must show that the requested witness is necessary to his defense. Under the Constitution, double jeopardy attaches only to multiple prosecutions by the same sovereign and does not prohibit trial of the same defendant for the same crime in, for example, state and federal courts or in the courts of two states. See *Burton* v. *Maryland*, 395 U.S. 784 (1969).

To clarify our reading of the Covenant with respect to these issues, we recommend the following understanding, similar to the one proposed in 1978:

> The United States understands that subparagraphs 3(b) and (d) of Article 14 do not require the provision of a criminal defendant's counsel of choice when the defendant is provided with court-appointed counsel on grounds of indigence, when the defendant is financially able to retain alternative counsel, or when imprisonment is not imposed. The United States further understands that paragraph 3(e) does not prohibit a requirement that the defendant make a showing that any witness whose attendance he seeks to compel is necessary for his defense. The United States understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgment of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit, as is seeking a new trial for the same cause.

### 5. Article 50 (federalism)

In light of Article 50 ("The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions"), it is appropriate to clarify that, even though the Covenant will apply to state

and local authorities, it will be implemented consistent with U.S. concepts of federalism.

The following recommended understanding is a modification of the understanding adopted on the same point in connection with the Torture Convention:

> The United States understands that this Convention shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the State and local governments; to the extent that State and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the State or local governments may take appropriate measures for the fulfillment of the Convention.

The proposed understanding serves to emphasize domestically that there is no intent to alter the constitutional balance of authority between the State and Federal governments or to use the provisions of the Covenant to "federalize" matters now within the competence of the States. (During the negotiation of the Covenant, the "federal-state" issue assumed some importance because there were legally justified practices, at the State and local level, which were both manifestly inconsistent with the Covenant and beyond the reach of Federal authority under the law in force at that time; that is no longer the case.)

A reservation is not necessary with respect to Article 50 since the intent is not to modify or limit U.S. undertakings under the Covenant but rather to put our future treaty partners on notice with regard to the implications of our federal system concerning implementation. Moreover, an attempt to reserve to this article would likely prove contentious. For example, in the face of objections from other States Parties, Australia recently withdrew its initial reservation to Article 50 (to the effect that implementation of the Covenant would be a matter for the authorities of its constituent States where the subject-matter was within the States' legislative, executive and judicial jurisdiction), replacing it with a declaration that, since it has a federal system, the Covenant will be implemented by Commonwealth, State and Territorial authorities having regard to their respective constitutional powers and arrangements concerning their exercise. The proposed understanding is similarly intended to signal to our treaty partners that the U.S. will implement its obligations under the Covenant by appropriate legislative, executive and judicial means, federal or state as appropriate, and that the Federal Government will remove any federal inhibition to the States' abilities to meet their obligations.

DECLARATIONS

*1. Non-self-executing treaty*

For reasons of prudence, we recommend including a declaration that the substantive provisions of the Covenant are not self-executing. The intent is to clarify that the Covenant will not create a private cause of action in U.S. courts. As was the case with the Torture Convention, existing U.S. law generally complies with the Covenant; hence, implementing legislation is not contemplated.

We recommend the following declaration, virtually identical to the one proposed in 1978 as well as the one adopted by the Senate with respect to the Torture Convention:

> The United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing.

*2. Restrictions on rights*

In a number of respects the Covenant recognizes the possibility that States Party may in exceptional circumstances limit or circumscribe certain rights otherwise protected. For example, Article 12(3) permits States Party by law to impose restrictions on the rights to liberty of movement and freedom to choose residence when "necessary to protect national security, public order (ordre public), public health or morals or the rights and freedoms of others," when consistent with the other rights recognized in the Covenant. Similar restrictions are permissible with regard to the right of peaceful assembly (Article 21) and freedom of association (Article 22(2)); somewhat narrower restrictions are authorized with respect to the right to a fair and public hearing (Article 14(1)), freedom of religion (Article 18(3)), and the right to freedom of expression (Article 19(3)). Certain limited derogations from recognized rights are also permitted during times of public emergency threatening the life of the nation under Article 4.

Since such limitations are permissible rather than required, it is not necessary to condition U.S. ratification on a reservation. However, because of concerns raised in particular by representatives of the U.S. media over restrictions placed by foreign governments on the free flow of information and ideas, we believe it would be beneficial to include in our instrument of ratification a declaration along the following lines:

> It is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, Article 5, paragraph 2, which provides that fundamental human rights existing in any State Party

may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to Article 19, paragraph 3, which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect of all such restrictions and limitations.

### 3. Article 41 (State-to-State complaints)

Under Article 41, States Party to the Covenant may accept the competence of the Human Rights Committee to consider state-to-state complaints by means of a formal declaration to that effect. It is in the interest of the United States to participate in and influence the state-to-state complaint procedure established by the Covenant, not least because it is hoped that the work of the Committee will contribute to the development of a generally accepted international law of human rights. (It should be noted that declarations made pursuant to Article 41 may be withdrawn at any time by notification to the Secretary-General.) It is our usual practice to inform the Senate of our intention to make such a declaration at the time of ratification; most recently, we followed this procedure with respect to the Torture Convention, concerning acceptance of the analogous competence of the Committee Against Torture to consider state-to-state complaints.

Accordingly, we recommend informing the Senate of our intent, subject to its approval, to make an appropriate declaration under Article 41 at the time of ratification, as follows:

> The United States declares that it accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims another State Party is not fulfilling its obligations under the Covenant.

### 4. Article 47 (savings clause on natural wealth and resources)

Article 47 provides that "[n]othing in the present Covenant shall be interpreted as impairing the inherent right of all peoples to enjoy and utilize fully and freely their natural wealth and resources." In 1978, the Administration proposed a caveat to this provision to emphasize the important, countervailing principle of international law requiring prompt, adequate and effective compensation in cases of expropriation or nationalization. Even though nothing in the Covenant permits states to avoid their obligations under international law or justifies arbitrary deprivation of property, we recommend the following declaration, identical to the one originally proposed:

The United States declares that the right re-
ferred to in Article 47 may be exercised only in
accordance with international law.

## VIII. Cost Estimate

The Congressional Budget Office has supplied the Committee
with the following information on the possible budgetary impact of
the International Covenant on Civil and Political Rights.

U.S. Congress,
Congressional Budget Office,
*Washington, DC, March 20, 1992.*

Hon. Claiborne Pell,
*Chairman, Committee on Foreign Relations,*
*U.S. Senate, Washington, DC.*

Dear Mr. Chairman: The Congressional Budget Office has re-
viewed the International Covenant on Civil and Political Rights
(Executive E, 95–2) and the accompanying Resolution of Ratifica-
tion, as ordered reported by the Senate Committee on Foreign Re-
lations on March 4, 1992. Ratification of the Covenant would not
affect the budgets of federal, state, or local governments.

The Committee on Foreign Relations has recommended that the
Senate advise and consent to ratification of the Covenant with the
conditions set forth in the Resolution of Ratification.

The Covenant is designed to guarantee civil and political rights
to persons within each country that ratifies it. In many instances,
the rights parallel those provided to U.S. citizens in the Bill of
Rights. Ratification would permit the United States to participate
in the work of the Human Rights Committee, which monitors com-
pliance of nations that have ratified the Covenant. Funding for the
Human Rights Committee is currently provided by the United Na-
tions, and ratification would not obligate the United States to pro-
vide any additional funding.

Ratification of the Covenant would not affect direct spending or
receipts. Therefore, pay-as-you-go procedures would not apply to
ratification.

Should the Committee so desire, we would be pleased to provide
further details on this estimate. The CBO staff contact is Kent
Christensen, who can be reached at 226–2840.

Sincerely,

James L. Blum
(For Robert D. Reischauer).

## IX. Text of Resolution of Ratification

*Resolved, (two-thirds of the Senators present concurring therein),*
That the Senate advise and consent to the ratification of the Inter-
national Covenant on Civil and Political Rights, adopted by the
United Nations General Assembly on December 16, 1966, and
signed on behalf of the United States on October 5, 1977, (Execu-
tive E, 95–2), subject to the following reservations, understandings,
declarations and proviso:

I. The Senate's advice and consent is subject to the following res-
ervations:

(1) That Article 20 does not authorize or require legislation or other action by the United States that would restrict the right of free speech and association protected by the Constitution and laws of the United States.

(2) That the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below 18 years of age.

(3) That the United States considers itself bound by Article 7 to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.

(4) That because U.S. law generally applies to an offender the penalty in force at the time the offense was committed, the United States does not adhere to the third clause of paragraph 1 of Article 15.

(5) That the policy and practice of the United States are generally in compliance with and supportive of the Covenant's provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of Article 10 and paragraph 4 of Article 14. The United States further reserves to these provisions with respect to individuals who volunteer for military service prior to age 18.

II. The Senate's advice and consent is subject to the following understandings, which shall apply to the obligations of the United States under this Covenant:

(1) That the Constitution and laws of the United States guarantee all persons equal protection of the law and provide extensive protections against discrimination. The United States understands distinctions based upon race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or any other status—as those terms are used in Article 2, paragraph 1 and Article 26—to be permitted when such distinctions are, at minimum, rationally related to a legitimate governmental objective. The United States further understands the prohibition in paragraph 1 of Article 4 upon discrimination, in time of public emergency, based "solely" on the status of race, colour, sex, language, religion or social origin not to bar distinctions that may have a disproportionate effect upon persons of a particular status.

(2) That the United States understands the right to compensation referred to in Articles 9(5) and 14(6) to require the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity. Entitlement to compensation may be subject to the reasonable requirements of domestic law.

(3) That the United States understand the reference to "exceptional circumstances" in paragraph 2(a) of Article 10 to permit the imprisonment of an accused person with convicted persons where

appropriate in light of an individual's overall dangerousness, and to permit accused persons to waive their right to segregation from convicted persons. The United States further understands that paragraph 3 of Article 10 does not diminish the goals of punishment, deterrence, and incapacitation as additional legitimate purposes for a penitentiary system.

(4) That the United States understands that subparagraphs 3(b) and (d) of Article 14 do not require the provision of a criminal defendant's counsel of choice when the defendant is provided with court-appointed counsel on grounds of indigence, when the defendant is financially able to retain alternative counsel, or when imprisonment is not imposed. The United States further understands that paragraph 3(e) does not prohibit a requirement that the defendant make a showing that any witness whose attendance he seeks to compel is necessary for his defense. The United States understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgment of acquittal has been rendered by a court of the same governmental unit, whether the Federal Government or a constituent unit, as is seeking a new trial for the same cause.

(5) That the United States understands that this Convention shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriated measures for the fulfillment of the Convention.

III. The Senate's advice and consent is subject to the following declarations:

(1) That the United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing.

(2) That it is the view of the United States that States Party to the Covenant should wherever possible refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant. For the United States, Article 5, paragraph 2, which provides that fundamental human rights existing in any State Party may not be diminished on the pretext that the Covenant recognizes them to a lesser extent, has particular relevance to Article 19, paragraph 3, which would permit certain restrictions on the freedom of expression. The United States declares that it will continue to adhere to the requirements and constraints of its Constitution in respect to all such restrictions and limitations.

(3) That the United States declares that it accepts the competence of the Human Rights Committee to receive and consider communications under Article 41 in which a State Party claims that another State Party is not fulfilling its obligations under the Covenant.

(4) That the United States declares that the right referred to in Article 47 may be exercised only in accordance with international law.

IV. The Senate's advice and consent is subject to the following proviso, which shall not be included in the instrument of ratification to be deposited by the President:

Nothing in this Covenant requires or authorizes legislation, or other action, by the United States of America prohibited by the Constitution of the United States as interpreted by the United States.

## X. APPENDIX A

THE WHITE HOUSE,
*Washington, DC, August 8, 1991.*

Hon. CLAIBORNE PELL,
*Chairman, Senate Foreign Relations Committee,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to urge the Senate to renew its consideration of the International Covenant on Civil and Political Rights with a view to providing advice and consent to ratification.

The end of the Cold War offers great opportunities for the forces of democracy and the rule of law throughout the world. I believe the United States has a special responsibility to assist those in other countries who are now working to make the transition to pluralist democracies. As you know, we have actively been providing such assistance through a variety of programs authorized and funded by the Congress in the Soviet Union, Eastern Europe and elsewhere.

United States ratification of the Covenant on Civil and Political Rights at this moment in history would underscore our natural commitment to fostering democratic values through international law. The Covenant codifies the essential freedoms people must enjoy in a democratic society, such as the right to vote, freedom of peaceful assembly, equal protection of the law, the right to liberty and security, and freedom of opinion and expression. Subject to a few essential reservations and understandings, it is entirely consonant with the fundamental principles incorporated in our own Bill of Rights, U.S. ratification would also strengthen our ability to influence the development of appropriate human rights principles in the international community and provide an additional and effective tool in our efforts to improve respect for fundamental freedoms in many problem countries around the world.

I am aware that several other human rights treaties enjoy substantial support in the Senate and the public. The Department of State is pursuing its ongoing interagency review of these other treaties.

I have asked the Secretary of State to assist the Foreign Relations Committee in acting on the Covenant without delay. I hope you will support this effort.

Sincerely,

GEORGE BUSH.

## XI. APPENDIX B

RESPONSES TO SENATOR MOYNIHAN'S QUESTIONS ON ARTICLE 28 OF
THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

Q. 1. Does Article 22 of the Covenant alter or amend existing legal requirements under the National Labor Relations Act, as amended, or any other Federal or State labor law statute applicable to freedom of association, the right to organize, and collective bargaining in the private and public sectors?

A. No. Article 22 only provides for a general right of freedom of association, including the right to form and join trade unions for the protection of his interests. These rights are fully contemplated by the First Amendment to the U.S. Constitution with respect to free speech, petition and assembly.

The Covenant does not address or encompass the more detailed legal requirements of the National Labor Relations Act and other Federal and State labor laws in the private and public sectors, which themselves are consistent with the First Amendment. Because the First Amendment to the Constitution fully addresses the scope of Article 22, we believe that ratification of the Covenant has no bearing on and does not, and will not, require any alteration or amendment to existing Federal and State labor law.

Article 22 does not address the specific requirements of Federal and State labor law and, therefore, it is to be distinguished from the "freedom of association" provisions of Article 8 of the International Covenant on Economic, Social and Cultural Rights and in ILO Convention 87. Both of these international instruments set out specific protections of trade union rights that are not contemplated by Article 22. It does not, for example, include the right to strike, as the Human Rights Committee has confirmed in its decision on the admissibility of Case No. 118/1982 (J.B. et al. v. Canada). As noted in the 1969 "Comparative Analysis of the International Covenants on Human Rights and International Labor Conventions and Recommendations," contained in the Official Bulletin of the International Labor Office, the Covenant "provides in terms only for the right to form and join trade unions for the protection of one's own interests and does not make any explicit provision for the series of safeguards laid down in" ILO Convention 87.

Moreover, Article 22(3) of the Covenant, which states that parties to the Covenant are not thereby authorized to prejudice the guarantees provided by ILO Convention 87, can only be read as confirmation of the fact that Article 22(1) is not congruent with ILO Convention 87. This is confirmed by the debate in the Third Committee in 1961 over this provision; as quoted in Bossuyt, "Guide to the 'Travaux Preparatoires' of the International Covenant on Civil and

(26)

Political Rights'' (Martinus Nijhoff, 1987) at p. 436: ''Those who favored retaining the paragraph argued, among other things, that * * * the ILO Convention was far more comprehensive in the matter of trade union rights than article [22], which dealt with freedom of association generally, * * * and that deletion of the reference might be misinterpreted as relieving Farties to that Convention of their responsibility under it.''

In any event, the Covenant will be adopted as a non-self-executing treaty. As a non-self-executing treaty, Article 22 of the Covenant would not, if ratified, become directly enforceable as United States law in U.S. courts. As the preceding discussion has made clear, the First Amendment to the U.S. Constitution already brings the United States into compliance with the Covenant. No additional implementing legislation is required.

**Q. 2. Does ratification of Article 22 of the Covenant by the United States commit the U.S. to ratify ILO Convention 87?**

A. No. Ratification of the Covenant would not obligate us in any way to ratify ILO Convention 87 or any other international agreement. Moreover, as the answer to the previous question states, the two agreements are different in the scope of the rights and obligations they provide.

○